716 P.2d 505

Phylis ELCE and Gary Elce, Jr.; Richard L. Fenison and Donna Fenison, husband and wife; R.H. Pierce Manufacturing Co., Inc., dba Pierce Corp., an Oregon Corporation; and Wausau Insurance Company, Plaintiffs-appellants,

v.

STATE of Idaho and Western Construction, Inc., an Idaho corporation, Defendants-respondents.

No. 15339.

Supreme Court of Idaho.

March 28, 1986.

**362**

Craig R. Jorgensen, of Lyon & Jorgensen, Pocatello, for plaintiffs-appellants.

Jeffrey A. Strother, of Moffatt, Thomas, Barrett & Blanton, Boise, for defendant-respondent State.

Richard St. Clair, of St. Clair, Hiller, Wood & McGrath, Idaho Falls, for defendant-respondent Western Const. Co.

BAKES, Justice.

1986 Opinion No. 38, filed March 3, 1986, is hereby withdrawn, and this opinion is substituted therefor.

Appellants, plaintiffs below, appeal from a district court judgment granting directed verdicts in favor of the State of Idaho and Western Construction, Inc. We affirm.

On August 9, 1979, a semi-truck owned by R.H. Pierce Manufacturing Co. and driven by Gary Elce, carrying a load of steel pipe, was traveling east on Interstate Highway 86 in Power County. Near the end of a temporary construction detour, on an "S" shaped curve which connected the detour with the existing Highway 30, Elce's truck, without leaving the paved roadway, tipped over onto its right side and slid down the center of the highway. The sliding truck then collided with a westbound semi-truck owned by Circle C Transportation and driven by Melvin Stout. As the result of the accident, Gary Elce died and his companion driver Richard Fenison, who was sleeping at the time, was injured. Both trucks were damaged.

On August 5, 1981, a complaint was filed against the State of Idaho and its highway contractor, Western Construction, Inc., by Elce's wife and son, Richard Fenison, and Pierce Manufacturing for the wrongful death of Elce, for damages due to the personal injury of Fenison, and for damages for property damage to Pierce Manufacturing's truck. The complaint alleged negligence on the part of the State of Idaho and Western Construction, Inc., the contractor responsible for the construction and maintenance of the detour.

The defendants made several pretrial motions. The district court issued an order, (1) granting defendants' motion to join Wausau Insurance as a real party in interest pursuant to I.R.C.P. 17;[1] (2) denying defendants' motion to join S.A.I.F. Corporation, the workmen's compensation surety for Pierce Manufacturing; (3) granting defendants' motion for leave to file a counterclaim against the Elces, Pierce Manufacturing, and S.A.I.F. Corporation for contribution and indemnity with regard to the Fenisons' personal injury claim; (4) granting defendants' motion for partial summary judgment on Pierce's claim seeking contribution for the amounts paid to Circle C and the Stouts; (5) granting defendants' motion in limine, prohibiting mention of any post-accident changes in the detour; (6) granting defendant's motion in limine, prohibiting mention of a prior accident which had occurred on the detour.[2]

---

1. Wausau Insurance Company, Pierce Manufacturing's insurer, had paid claims made by Pierce Manufacturing for damage to its truck, and to Richard Fenison, Circle C Transportation Company, and Melvin Stout. Wausau obtained a release from Melvin Stout and Estella Stout which purported to release Pierce Manufacturing and "all others directly or indirectly liable." Although the release mentioned Circle C, the release was signed only by the Stouts and not by any representative of Circle C.

2. The district court ultimately modified its decision regarding the prior accident, allowing plaintiffs to put on evidence outside the presence of the jury.

The case went to trial on November 1, 1983. Following presentation of all the evidence, but prior to final argument by counsel, the trial court granted the defendants' motion for a directed verdict and dismissed plaintiffs' complaint. In so doing, the court stated, "The plaintiffs failed to show by substantial evidence that the defendants were negligent or that their negligence, if any, was a proximate cause of Mr. Elce losing control of his tractor trailer rig." Plaintiffs now appeal. We affirm.

I

Appellants first contend that the district court applied an incorrect test in determining that the verdict should be directed in favor of the State of Idaho and Western Construction. Citing *Smith v. Great Basin Grain Co.*, 98 Idaho 266, 561 P.2d 1299 (1977), the district court stated:

> "The court viewed this matter the same as a judgment notwithstanding the verdict and based on the evidence before the court, the court was convinced that if the jury should return a verdict for the plaintiffs that it would not be based upon substantial evidence. Had a verdict been returned for the plaintiffs, the court would have granted a judgment notwithstanding the verdict."

■ We find no error in the standard used by the district court in ruling on this motion for a directed verdict. In *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 518 P.2d 1194 (1974), we very clearly stated that, "Because a motion for judgment n.o.v. is a delayed motion for directed verdict, this new standard of substantial evidence must also be applied to motions for directed verdicts made pursuant to I.R.C.P. 50(a)." *Id.* at 736, 518 P.2d at 1198. *See also Brown v. Jerry's Welding & Constr. Co.*, 104 Idaho 893, 895, 665 P.2d 657, 659 (1983). The district court was correct in concluding that if there was no substantial evidence of either defendant's negligence or of proximate cause, then the motion for directed verdict should be granted. *Mann v. Safeway Stores, supra.*

■ In considering a motion for a directed verdict under the substantial evidence standard, the case should be submitted to the jury if the evidence is of sufficient quantity and probative value that reasonable minds could have concluded that a verdict in favor of the non-moving party was proper. *Stephens v. Stearns*, 106 Idaho 249, 253, 678 P.2d 41, 45 (1984); *Owen v. Burcham*, 100 Idaho 441, 447, 599 P.2d 1012, 1018 (1979). However, a verdict cannot be based on conjecture. *Thomas Helicopters, Inc. v. Santan Ranches*, 102 Idaho 567, 570, 633 P.2d 1145, 1148 (1981); *Chisholm v. J.R. Simplot Co.*, 94 Idaho 628, 632, 495 P.2d 1113, 1117 (1972). We have recently stated that "substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Idaho State Insurance Fund v. Calvin J. Hunnicutt*, 110 Idaho 257, 260, 715 P.2d 927, 930 (1985).

II

With these standards of review established, and having concluded that the district court applied these standards in evaluating the evidence on the motion for directed verdict, we next review the record to determine whether the district court erred in concluding that plaintiffs failed to show by substantial evidence that the defendants' negligent conduct caused the accident. In our review, we acknowledge that the district court was in a better position to apply the substantial evidence test, since the court observed the witnesses' testimony, some of which related to gesturing and pointing out the specifics of exhibits describing features of the roadway. Since, on the record, we cannot observe this testimony, the trial court was in a better position to evaluate the evidence than we are.

A.

■ Regarding the granting of the directed verdict in favor of the contractor, Western Construction, Inc., this Court has previously held that a public works contractor, who has performed work according to

plans and specifications, may not be found liable for any damages resulting from the construction. *Black v. Peter Kiewit Sons Co.*, 94 Idaho 755, 757, 497 P.2d 1056, 1058 (1972); *Gates v. Pickett & Nelson Constr. Co.*, 91 Idaho 836, 842, 432 P.2d 780, 786 (1967). Having fully reviewed the record, we find no substantial evidence produced by the plaintiffs showing that Western Construction did not adhere to the plans and specifications provided by the state. Philip Rumsey, resident engineer in charge of highway construction in the American Falls area, testified both for the plaintiffs and for the defendants that the plans for the detour were designed in his office and received approval from the highway department. He further testified that the plans were followed by the contractor. There was no substantial evidence otherwise. Accordingly, the trial court was correct in granting the directed verdict in favor of Western Construction, Inc. *See Black v. Peter Kiewit Sons Co., supra.*

### B.

The plaintiffs' claim against the State of Idaho was based primarily upon their allegation that the 45 m.p.h. posted speed limit for the curve upon which the plaintiff Elce's truck tipped over was too fast. Additionally, plaintiffs claim that certain roadside conditions, such as the position of the barricades, inadequate shoulder width and other shoulder conditions, contributed to the accident. Accordingly plaintiffs allege that the State of Idaho was negligent in failing to bring all roadside conditions into conformance with engineering or design standards in effect at the time of the preparation of the detour design.

■ The liability of the State of Idaho in highway construction and design cases is limited substantially by the provisions of the Idaho Tort Claims Act. I.C. § 6–904 provides that:

"A governmental entity ... shall not be liable for any claim which:

. . . .

"(8) Arises out of a plan or design for construction or improvement to the high-

ways, roads, streets, bridges, or other public property where such plan or design is prepared *in substantial conformance* with engineering or design standards in effect at the time of preparation of the plan or design, approved in advance of the construction or approved by the legislative body of the governmental entity or by some other body or administrative agency, exercising discretion by authority to give such approval." (Emphasis added.)

In order to establish liability, the plaintiff must prove a claim which does not fall within the exception to governmental liability set out in I.C. § 6–904(8), and must establish that the governmental entity, or its employees acting within the course and scope of their employment, was "negligent or [committed] otherwise wrongful acts or omissions" which were the proximate cause of the plaintiff's injuries. *See* I.C. § 6–903.

Most of the evidence at trial dealt with the question of what engineering and design standards applied to detours around an interstate highway construction project, and whether or not this particular detour complied with such standards. To the extent that any standards were established, questions arose as to whether or not the overall detour was "in substantial conformance" with these existing standards, and whether or not any violations of existing standards contributed to or were the proximate cause of the plaintiff's truck tipping over.

Most of the evidence concerning how the accident happened was uncontroverted. On the morning of August 9, 1979, plaintiffs' decedent Gary Elce was driving eastbound in Interstate Highway 86. In the area where the completed interstate highway ended and the existing U.S. Highway 30 was under construction (in order to expand it to interstate standards), eastbound traffic, including Elce, was directed onto a frontage road which acted as the detour for both the eastbound and the westbound lanes of traffic. The frontage road had been resurfaced, the asphalt portion being 28 feet in width, with 13 foot lanes between

the center line and the outside traffic control line (fog line). The frontage road detour had a 45 m.p.h. posted speed limit on its entire length of approximately 4 miles. The August morning was clear and warm, and the pavement was dry. At the east end of the frontage road detour was the "S" curve where the accident occurred. The "S" curve linked the frontage road back to existing Highway 30 at the east end of the area where the construction work was in progress. In the process of negotiating the first portion of the "S" curve, Elce's truck, without leaving the paved portion of the roadway, overturned and slid down the highway several hundred feet before it impacted with the westbound truck driven by Melvin Stout and owned by Circle C Transportation Co. The record reflects that Elce had driven through this stretch of road and negotiated this same curve six times before, three times each way.

Stout, the only eye witness to the accident to testify, stated that he first observed Elce's truck when it was just entering the "S" turn about 1000–1100 feet away. He also testified that, after observing the truck he estimated that Elce's speed was 40–50 m.p.h. On cross examination he stated that Elce was driving "on the top side of my estimate," and that "he may have exceeded [the posted speed limit] one or two miles per hour." Stout testified that he was driving his truck approximately 25–30 m.p.h., and when the distance between them had closed to approximately 600–700 feet, and Elce's truck was nearly through the first turn, he observed the trailer on Elce's truck shift and tip over, dumping the load of pipe out onto the roadway. Stout testified that even after Elce's truck tipped over it remained on the asphalt roadway and slid down the pavement for about 500 feet before it struck his truck nearly head on in Stout's westbound lane of traffic. Stout testified that when he observed Elce's truck tip over, he locked his brakes and within two truck lengths, or approximately 100–120 feet, had nearly

stopped his truck. At the time of impact, Stout testified, he was going less than 5 m.p.h. All of the other evidence in the record supports Stout's observation that Elce's truck did not leave the highway either before or after it overturned.

Plaintiffs' witness, Thomas Foley, a Garrett Freightlines truck driver with 33 years experience, was permitted to testify as an expert. He was allowed to give his personal opinion that "the posted speed limit was too fast ..." for a truck like that driven by Elce. He further testified that when approaching the "S" curve in the eastbound lane of traffic, as Elce was, you could see the curve a quarter of a mile away, and you could see the double yellow line and the white fog line on the outside of the roadway turning into the curve from the same distance. He testified that he was familiar with the pavement markings, the warning signs, and the barricades along the right shoulder marking the turn, and he stated that "as far as the markings coming into the detour and the speed limit, I mean, you were well notified." Foley was not an engineer and testified that he knew nothing about road design standards. He nevertheless was of the opinion that the curve was unsafe at 45 m.p.h.

The primary issue at the trial, and most of the evidence, revolved around the issue of whether or not the detour was constructed according to "engineering or design standards in effect at the time of the preparation of the plan or design," as that phrase is used in I.C. § 6–904(8) of the Idaho Tort Claims Act.

In an attempt to establish the engineering or design standards that were in effect at the time of the preparation of the detour plan, the plaintiffs called Philip George Rumsey, the resident engineer in charge of construction in the American Falls area, for cross examination. Mr. Rumsey was the resident engineer on the construction project in question at the time of the accident. He identified plaintiffs' Exhibit E,[3] the standard specifications for highway construction in the State of Idaho, and testified that those standards applied

---

**3.** When plaintiffs initially sought to introduce

into evidence Exhibit E, the State of Idaho's

to the Raft River construction project. He further testified with regard to the detour that the standard specifications in Exhibit E "were not specifically formulated for that [the detour] purpose, but generally speaking, the construction techniques and the requirements would apply." However, in response to the question, "Does this standard specifications for highway construction [plaintiffs' Exhibit E] have anything to do with how this detour was laid out and designed?", he answered, "No." He further testified that, with regard to the detour, the standard specifications, identified as plaintiffs' Exhibit E, "does not define and propagate [sic] any standards for curvature." With regard to plaintiffs' Exhibit F,[4] a document entitled, A Policy on Geometric Design of Rural Highways (1965 ed.), by the American Association of State Highway Officials, Rumsey testified that while it may contain standards that would relate to the detour, the book was not formulated specifically for detours, but rather primarily for finished portions of the roadway that were designed for permanent use. He testified that the "S" curve connecting the frontage road back to the original Highway 30 was not a permanent road.

Rumsey identified plaintiffs' Exhibit G[5] as the Survey and Plans Division, Procedures Manual for the State of Idaho Department of Highways. He testified that plaintiffs' Exhibit G was a manual containing standards that are followed by the state in design and construction of highways, including the Raft River project. He stated that the manual related to the frontage road portion of the project and in response to the question of whether or not the standards in Exhibit G related "to the detour at the east end from the frontage road back to Highway 30," he answered, "They relate to it; they do not dictate it." He indicated that portions of Part 12 of that manual may relate to the detour. He also indicated that certain general portions in Part 14 relate to the design and construction of the detour and portions did not, without being asked to identify specific standards which were applicable.

Plaintiffs' Exhibits I, J, K, and L were identified by Rumsey and offered by the plaintiffs. Those exhibits showed that the

Standard Specifications for Highway Construction, the defendants objected, pointing out that most of the specifications were irrelevant to the detour at issue here. The document was not, therefore, admitted at that time. At a later time, the court stated, "Exhibit E has been marked and will be admitted. However, the whole manual you might say will be admitted, but the only thing that will go to the jury are the documents that are relevant. No sense sending the whole book in." The exhibit has not been stamped "Admitted into Evidence," and a review of the record indicates that Exhibit E as a whole was not intended to be admitted into evidence. It is clear, however, that two pages, Exhibit FFF, containing the specifications for traffic control devices were admitted into evidence by the plaintiffs during cross examination of Rumsey.

4. Plaintiffs originally offered the entire document, A Policy on Geometric Design of Rural Highways (1965 ed.), into evidence as Exhibit F. Following defendants' objection to the admission of the entire document, the exhibit was withdrawn. However, particular pages of the document were later entered into evidence. During the direct examination of Gerald Cysewski, plaintiffs placed into evidence page 235 of the manual, relating to shoulder width, and page 212, relating to the general design of horizontal curvature. Pages 149, 150, and 151, relating to measuring and recording sight distances, and pages 212, 213 and 214, relating to horizontal and vertical alignment of the highway, and page 238, relating to super-elevation run-off, were introduced by the plaintiffs during cross examination of Philip Rumsey.

5. The plaintiffs originally offered the entire document, Survey & Plans Division, Procedures Manual for the State of Idaho, Department of Highways, as Exhibit G. Following defendants' objection, the exhibit was withdrawn and individual pages of the manual were entered into evidence. During the direct examination of Gerald Cysewski, plaintiffs placed into evidence pages articulating the applicability of the standards to all classes of *highways* and *frontage roads,* as well as a chart relating to design speed and horizontal curvature. During the cross examination of Philip Rumsey, sections of the manual relating to (1) coordination of horizontal and vertical alignment, (2) a cross section of a two-lane rural secondary highway, (3) guard rails and non-traversable road hazards, and (4) geometric standards for all state primary and secondary rural highways, were entered into evidence. Sections of the manual relating to the cross section of primary highways were marked for identification, but not admitted into evidence.

contractor requested the use of the frontage road as a detour; that the state had approved the request; that the detour was designed in Rumsey's office and was approved by the district engineer; and that the final design was furnished to the contractor. Rumsey testified that the contractor built the detour as it was designed and that the "S" curve connecting the frontage road to the existing Highway 30 was consistent with design standards. Later in the state's case, Rumsey testified that the detour was constructed to meet national design standards and had been designed, engineered and built to a 50 m.p.h. designed speed, but that speed was restricted to 45 m.p.h. for a margin of safety.

Appellants, in support of their argument on appeal that there were issues of fact which should have been submitted to the jury, rely primarily upon the testimony of Gerald Cysewski, a civil engineer from Seattle, Washington, who was qualified as an expert in highway design and construction matters. Cysewski had examined the detour site and gave several opinions concerning the design of the detour. First, he gave a general opinion that the design of the detour did not meet national or state standards. He then attempted to specifically identify several standards which he felt had not been met, primarily by reference to plaintiffs' Exhibit F, the manual entitled, A Policy on Geometric Design of Rural Highways, and Exhibit G, the survey and plans procedural manual for the highway department. Both Exhibits F and G were withdrawn from evidence, however, and other exhibits, representing specific portions of Exhibits F and G, were identified as the portions which did not meet the plans and specifications. *See* footnotes 4, 5.

At several places throughout his testimony, Cysewski claimed that the detour had to, in effect, be constructed to interstate highway standards. Thus he stated, relying upon the withdrawn Exhibits F and G, that replacement roads had to be constructed to a standard equal to the road it replaces; that the "S" turn was not really a detour, but was part of the interstate highway system and had to be constructed to the same standards as an interstate highway. The trial court rejected, and upon this record we reject the assertion that this detour road had to be constructed to the same standards as the interstate highway. Such an argument would require that the state construct an alternative interstate highway alongside a portion of the interstate highway under construction. There is no substantial evidence in this record to sustain the conclusion that "engineering or design standards in effect at the time of preparation of the plan or design," I.C. § 6–904(8), require a detour around an interstate highway construction project to itself be constructed to the standards of an interstate highway. The trial court did not err in so concluding.

Plaintiffs' witness Cysewski also identified several specific items which he contended demonstrated that the engineering and design of the roadway did not meet standards in effect at the time. He first stated that the "S" curve at the end of the detour did not have enough "run-off" between the two curves, and as a result there was a tendency for a truck to drift across the roadway. On direct examination he testified that the design had less than 200 feet of run-off between the two curves, and this did not meet adequate standards. However, on cross examination, when provided with the official plans and specifications for the detour, Exhibit JJ, he acknowledged that the run-off between the two curves was 240 feet and that that distance did meet standards.

Cysewski further testified that he drove the curve where the accident occurred with a ball bank indicator and that from that experiment he determined that the speed of 45 m.p.h. was too high for the curve. However, he acknowledged that when he drove the curve at 45 m.p.h. the ball bank indicator read only 8° which was within the standards. Further, he stated that he was cutting the corner and as a result the test was not accurate. He did not retest at 45 m.p.h. Rather, he testified that he ran the test at 40 m.p.h. and received a 12° reading. From that he concluded that the ball bank test suggested a design speed of 35 m.p.h. for the turn. Since design standards per-

mit a 10° reading at 45 m.p.h., Cysewski's tests were hardly conclusive. Further, on cross examination, Cysewski acknowledged that the curve was visible for a quarter of a mile, confirming, as the Garrett Freightlines truck driver had testified, that Elce was "well notified" of the curve.

Cysewski further testified that certain roadside conditions approaching the "S" turn did not meet design standards. He mentioned that the barricades along the right shoulder were not adequate in number, and some were placed too close to the traveled portion of the roadway; that there was insufficient shoulder for a vehicle to get off the traveled portion of the roadway and that the ground on the shoulder was soft; and that there was a gulley washed in the barrow pit to the side of the detour as it entered the "S" curve. Cysewski testified that these conditions would cause a person to shy away from the shoulder and possibly entrap a driver into turning more abruptly on the curve than he otherwise might. He stated, "I think it's a case of entrapment by a series of multiplying and compounding hazards." Even assuming that the record contains substantial evidence that these conditions were not in conformance with engineering and design standards for detours around construction projects, the trial court was correct in concluding that there was no substantial evidence that any of these conditions was the proximate cause of the plaintiff's truck turning over. Cysewski's testimony was that Elce "very easily *could have* drifted to the right and [had] to correct it with these other hazards being so close to the edge of the pavement," and as a result *"possibly* [been] entrapped into a condition...." However, a verdict cannot be based upon conjecture, and there is nothing in the testimony of Cysewski, or in any of the physical facts, which indicates that the plaintiff Elce either saw these "hazards," or that they caused him to drift to the right and over correct his truck. None of the physical evidence supports the suggestion that the accident may have been caused by Elce over-correcting his truck. In fact, when Cysewski was cross examined as to why Elce was not driving slower, given the haz-

ards Cysewski had identified and the fact that Elce had driven through the detour six times previously, Cysewski acknowledged that "he may not have seen them the first time." Accordingly, we agree with the trial court that there was no substantial evidence to support a finding that any of the claimed "hazards" described by Cysewski were the proximate cause of Elce's truck tipping over. Cysewski's testimony that the "hazards" "possibly" might have caused the accident, or that Elce "very easily could have drifted to the right and [had] to correct it with these other hazards being so close to the edge of the pavement," would only invite conjecture as to whether or not such an "entrapment" had occurred.

In its case in defense, the state submitted evidence by engineer Rumsey that the detour, including the "S" curve in question, was designed for 50 m.p.h. speeds, but that the speed limit was set at 45 m.p.h. in order to introduce a margin of error. He expressed an expert opinion that the detour was "in substantial conformance with engineering or design standards in effect at the time of preparation of the plan or design." Witnesses Christensen and Green testified that after the detour was completed they tested the curve in question with the ball bank test at 45 m.p.h. and received an 8° reading, which was less than the standard design 10° permitted for 45 m.p.h. The state further produced the testimony of a Dr. Rudolph Limpert, a mechanical engineer and accident reconstruction specialist, who testified that a truck similar to Elce's would have to be going in excess of 63 m.p.h. to tip over on the curve in question. He also testified from his examination of the accident scene and the skid marks after it turned over, and the other physical evidence, that Elce's truck had to be going at least 66 m.p.h. at the time it turned over.

■ We have set out the evidence in substantial detail to point out that, while it is a close question in this case whether or not the trial court correctly granted the directed verdict, I.C. § 6–904(8) only required the plan or design for the detour to be in "substantial conformance" with engineering or design standards in effect at the

time. The trial court did not err in its ultimate conclusion, viewing the record as a whole, that the plan or design was in substantial conformance with engineering or design standards in effect at the time of the preparation of the plan or design. Nor did the trial court err in concluding that any defect in the plan or design for the detour, and any negligence on the part of the defendant State of Idaho, was not a proximate cause of Elce's truck turning over, the cause of the accident being the uncontroverted fact that Elce was driving in excess of the posted speed. We conclude that the trial court did not err in granting the defendants' motion. Accordingly, the judgment of the district court is affirmed.

Costs to respondents. No attorney fees allowed.

DONALDSON, C.J., and SHEPARD, BISTLINE and HUNTLEY, JJ., concur.