735 P.2d 1033

**GARRETT FREIGHTLINES, INC.; Truck Insurance Exchange; and Lloyds Underwriters at London, Plaintiff-respondents, Cross appellants,**

v.

**BANNOCK PAVING COMPANY, INC., Defendant-appellant, Cross respondent,**

and

**State of Idaho, Defendant.**

No. 16008.

Supreme Court of Idaho.

April 8, 1987.

Robert D. Lewis, of Cantrill, Skinner, Sullivan & King, Boise, for defendant-appellant, cross respondent.

Bobbi K. Dominick, of Elam, Burke & Boyd, Boise, for plaintiffs-respondents, cross appellants.

BAKES, Justice.

Bannock Paving Company (Bannock) appeals from a judgment entered after a jury trial in an action brought by Garrett Freightlines (Garrett), seeking contribution from Bannock and the State of Idaho for amounts paid in settlement of claims arising from a multi-vehicle accident at a road construction site on Interstate 84 near Mountain Home, Idaho. The jury returned a verdict apportioning fault to Bannock, 30%; to the state, 40%; and to Garrett Freightlines, 30%. Bannock appeals, contending that there is insufficient evidence to support the verdict or, in the alternative, that, as a public works contractor, it is immune to liability resulting from the accident at the road construction site. Garrett also appeals, contending that the trial court erred in denying Garrett's request for an increase in the jury's verdict, and for prejudgment interest on the damages awarded by the jury. We reverse and remand for a new trial.

On July 14, 1980, a Garrett Freightlines truck, driven by James Russell, collided with a series of vehicles stopped at a highway construction site on Interstate 84 west of Mountain Home. The stopped cars were waiting to be escorted through the construction site by a pilot car. A pickup was the last car in a line of vehicles stopped by the flagman in the right westbound lane of I-84, and the Garrett truck struck the pickup at a speed between 45 and 55 m.p.h. without appreciably slowing down or attempting to swerve to avoid collision. The force of the impact was transferred throughout the entire line of stopped vehicles which consisted of first, the pickup, second a Greyhound-type bus, and then three or four other cars. Over 50 people were injured, including four deaths—the driver of the Garrett truck and three people in the pickup.

The construction project on I-84 was a sealcoat/resurfacing operation. The project was designed by the Idaho Department of Transportation and, as originally designed, called for a controlled flow of traffic through the construction site without stopping traffic and without the use of pilot cars. The construction project was awarded, after bidding, to Bannock.

Following the award, Bannock requested the Department of Transportation to modify the traffic control plan. The state agreed to a modification and redesigned the traffic control plan to provide for stopping traffic and the use of pilot cars to shuttle traffic through the construction area. The modification was needed, according to Bannock, because trucks hauling materials to the site had to cross and/or enter the lane of traffic to reach road segments of the project. It was also necessary to control the dust and dirt which would impair visibility and also to control the dangers of flying rock. The modified traffic control plan included the addition of

two sets of signs previously not included in the traffic control plan: two "Prepare to Stop" signs, and two "Flagman Ahead" signs.

Bannock was responsible, as part of its construction contract, to install and maintain all the traffic control signs included in the plan as finally modified and approved by the state. Before the construction began, the state reviewed the actual sign placement to assure that it complied with the traffic control plan and approved such placement. All aspects of the construction project, including implementation of the traffic control plan, were carried out by Bannock with state supervision.

Garrett's complaint against Bannock and the State of Idaho sought contribution for damages which it had paid as the result of claims paid to injured parties by Garrett and its insurers for damages resulting from the negligence of Garrett's driver in causing the accident. The complaint for contribution filed by Garrett and Exchange alleged that they had paid $387,378.36 in settlement of claims arising from the accident. The complaint alleged that Bannock and the state were negligent in the performance of the construction project and specifically in failing to properly manage and supervise traffic flow around the construction project. The state moved for summary judgment on February 20, 1985, contending that it was immune to liability pursuant to I.C. § 6–904(8). Bannock filed a motion for summary judgment on February 27, 1985, alleging that as a public works contractor it enjoyed a common law immunity to liability arising from the public works construction project on the Interstate. Both motions for summary judgment were denied.

An amended complaint was filed which added a new party plaintiff, Lloyds, and raised the amount of damages claimed to $747,608.58. The case proceeded to trial, and the state's defense was based upon I.C. § 6–904(8), or so called "design immunity." Bannock offered as its defenses both common law immunity held by a public works contractor who performs according to plans and specifications supplied by the public

agency, and the defense that its conduct was not a proximate cause of the accident. Both the state and Bannock moved for directed verdicts following the presentation of plaintiff's case and at the conclusion of their own case. The motions were denied by the court, and the case was allowed to go to the jury which found that Garrett and its driver were 30% at fault, the state 40% at fault, and Bannock 30% at fault. Following the verdict both the state and Bannock moved for a new trial or, in the alternative, for j.n.o.v. Garrett, Exchange and Lloyds moved for an award of prejudgment interest. All those motions were denied, and Bannock and the state appealed. The state subsequently settled its appeal with Garrett and the insurance companies; thus, Bannock remains the only appellant in the present case. Garrett, Exchange and Lloyds cross appealed.

I

Bannock contends on appeal that the evidence adduced at trial cannot, as a matter of law, support the jury's assessment of negligence, causation and concomitant liability. Bannock contends that there is no evidence upon which a reasonable jury could find either that its conduct was a proximate cause of the accident, or that its negligence was equal to that of Garrett's driver. Garrett, on the other hand, contends that there is sufficient evidence of both negligence and proximate cause to support the jury's verdict.

■ Garrett's allegations of negligence against Bannock center on failure to maintain two of the signs in the warning sign package, and its failure to properly supervise and provide adequate flagmen for traffic control during the course of the project. Apart from these specific allegations concerning Bannock, Garrett alleges negligence in failure of the signing package's design to adequately warn motorists of a hazard created by Bannock on the Interstate. Garrett contends that the signing package created confusion and thus was a contributing cause of the accident in question. However, since the case against the Idaho Department of Transportation has

been settled by Garrett, it is essential to separate the allegations which assert a claim against Bannock, as distinguished from allegations which assert a claim against the Department of Transportation. It is established law in this state that a highway public works contractor, such as Bannock, may only be held liable for its own negligence, if any, in implementing and executing the public works contract. *Green v. Bannock Paving Co.*, 111 Idaho 3, 720 P.2d 186 (1986); *Elce v. State*, 110 Idaho 361, 716 P.2d 505 (1986); *Black v. Peter Kiewit Sons' Co.*, 94 Idaho 755, 497 P.2d 1056 (1972).

> "This general rule is applicable in Idaho, where this Court has held that if a contractor performs his work according to plans and specifications, no liability may be imposed upon him for any damage resulting from such construction." *Black v. Peter Kiewit Sons' Co.*, 94 Idaho at 757, 497 P.2d at 1058.

The evidence in the record reflects that, apart from the allegations and proof of failure to maintain the warning signs, and the failure to properly supervise the flagmen, Garrett's other allegations that the traffic control plan failed to adequately warn motorists or that it created confusion, and its allegations that the entire flagging operation was inadequately planned and staffed, deal entirely with the design of the traffic control plan which was the state's responsibility, not Bannock's. Bannock's responsibility extended only to implementing the state's plan. *Elce v. State, supra.* The modified traffic control plan, although suggested by Bannock, was designed and approved by the Idaho Department of Transportation. The modified plan specified the number of signs and flagmen to be used during the course of the sealcoat operation. Garrett's allegations of a poorly designed flagging operation, or inadequate number of flagmen, is merely a component of its inadequate design argument which, if true, was the responsibility of the State of Idaho, not Bannock. The state made the decision with regard to the number of flagmen and the placement of the flagmen. It was the agents of the Department of Transportation who determined that only

one flagman was necessary at the pilot car holding area. Under our decisions in *Black, Elce* and *Green*, the only evidence which lends itself to the question of negligence on the part of Bannock in the present case is the allegation that it failed to properly maintain two of the thirteen signs contained in the traffic control plan approved by the state, and that it failed to adequately supervise and direct the flagman in carrying out his responsibilities. We return then to those allegations and proof of negligence in order to determine whether or not there is substantial competent evidence to support the jury's findings in this case.

■ Prior to doing so, we set forth the standard of review on appeal. As a general rule, issues of negligence and causation are questions of fact for the jury and their verdict on such matters will not, in most instances, be disturbed on appeal. *Stephens v. Stearns*, 106 Idaho 249, 678 P.2d 41 (1984); *Nelson v. Northern Leasing Co.*, 104 Idaho 185, 657 P.2d 482 (1983); *Mann v. Gonzales*, 100 Idaho 769, 605 P.2d 947 (1980). However, when it appears to the reviewing court that the verdict is either: (1) not supported by substantial competent evidence, *Elce v. State, supra;* or (2) against the clear weight of the evidence, *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986); or, in other words, if upon its review of the evidence in the record the reviewing court determines that reasonable minds could not differ concerning the issues of negligence or causation, then those issues become questions of law and not of fact upon which the court may freely rule. *Munson v. State, Department of Highways*, 96 Idaho 529, 531 P.2d 1174 (1975); *Annau v. Schutte*, 96 Idaho 704, 535 P.2d 1095 (1975); *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). Furthermore, when reviewing a jury verdict on appeal the evidence adduced at trial is construed in a light most favorable to the party who prevailed at trial, here the respondents. *Hazen v. General Store*, 111 Idaho 972, 729 P.2d 1035 (1986); *Higginson v. Westergard*, 100 Idaho 687, 604 P.2d 51 (1979). However, a verdict cannot be

based on conjecture. *Elce v. State,* 110 Idaho 361, 363, 716 P.2d 505, 507 (1986); *Thomas Helicopters, Inc. v. San Tan Ranches,* 102 Idaho 567, 570, 633 P.2d 1145, 1148 (1981); *Chisholm Bros. v. J.R. Simplot Co.,* 94 Idaho 628, 632, 495 P.2d 1113, 1117 (1972). When there is no substantial evidence to support the verdict, or when the verdict is against the great weight of the evidence, the verdict cannot stand.

Having established the standards of review, we now review the evidence in the record to determine whether the jury verdict in the present case regarding negligence and causation is supported by substantial competent evidence or is against the clear weight of the evidence. Reviewing the record in the context of the negligence claim by Garrett against Bannock Paving in causing the accident in question, we find the following evidence. The Garrett truck left Salt Lake City, Utah, during the previous night at about 1:30 a.m., July 16, 1980. The accident occurred the next morning at approximately 9:25 a.m. 250 feet past Exit 90 (the off ramp) on the westbound lanes of Interstate 84 near Mountain Home, Idaho. That stretch of the Interstate is flat and straight. The weather was clear and warm, the sun was shining, and the pavement was dry. The sealcoat operation conducted by Bannock Paving commenced that morning at approximately 9:00 a.m. Prior to the opening of the project, both the state representative supervising the sealcoat operation and the contractor's representative drove through the project area to assure that all warning signs were up and properly placed. The uncontroverted testimony of both was that the signs were up and properly placed prior to the opening of the project which was approximately 20 to 30 minutes prior to the time of the accident.

Motorists traveling in the westbound lanes of Interstate 84 were notified of the construction for a mile and a half in advance of the construction site by the following sequence of signs, one on each side of the westbound lanes: two "Road Construction Ahead" signs, two "Merge Right" signs, two "Left Lane Closed 2000 ft."

signs, two signs containing a "merge right" symbol. Approaching the accident site the traffic control plan called for two "Prepare to Stop" signs, and two "Flagman Ahead" signs. All of the warning signs were 4 ft. × 4 ft. square, were bright fluorescent orange in color and, with the exception of the "Flagman Ahead" and "Prepare to Stop" signs, were mounted on posts and were approximately 7 feet above the surface of the pavement. The top of the warning sign containing the merge right symbol also had attached to it a flashing yellow light and two red warning flags. The "Prepare to Stop" and "Flagman Ahead" signs were mounted on tripods, with the bottom of the signs approximately one foot above the pavement. Additionally, the "Prepare to Stop" and "Flagman Ahead" signs were placed closer to the right and left lanes of travel in the westbound lanes than were any of the other warning signs. (The "Prepare to Stop" and "Flagman Ahead" signs were placed on the paved shoulder, whereas the other warning signs were placed off the paved shoulder on either side.)

After traveling through the foregoing signing sequence, motorists in the westbound lanes encountered eighteen sawhorse barricades painted with slanted orange vertical lines and having mounted thereon a sign with an arrow symbol pointing to the right. The sawhorse barricades were approximately three feet tall and eight feet long. The barricades gradually closed the left lane of traffic and moved traffic into the right lane of travel. A large flashing arrow was positioned immediately following the sawhorse barricades, directing traffic to drive in the right westbound lane. The dimensions of the flashing arrow sign were 6 ft. × 3 ft., and it was mounted in the bed of a pickup truck so that the sign was approximately 7 to 8 feet above the surface of the pavement. The uncontroverted testimony in the record indicates that the flashing arrow sign alone was visible for nearly a mile prior to the construction zone.

The testimony was uncontroverted that with the exception of the "Flagman

Ahead" and "Prepare to Stop" signs on the left hand shoulder, all signs, barricades and the flashing arrow warning device were up and in place and operating at the time of the accident, including the "Flagman Ahead" and the "Prepare to Stop" signs on the right shoulder. However, the evidence does raise a question regarding whether the "Prepare to Stop" and "Flagman Ahead" signs on the left shoulder were standing up at the time of the accident. The testimony of Bannock's representative and one state representative was that a few minutes after the accident they checked the signs, and the "Prepare to Stop" and "Flagman Ahead" signs on both sides of the road were up. However, another transportation department representative testified that an hour to an hour and a half after the accident he checked and the "Prepare to Stop" and "Flagman Ahead" signs on the left shoulder of the road were down. Additionally, a videotape taken through the windshield of a state police vehicle as it traversed the project approximately an hour to an hour and a half after the accident discloses that the "Prepare to Stop" and "Flagman Ahead" signs on the left shoulder were down at the time the video was taken.

In addition to the warning signs in place at the time of the accident, five to six vehicles were stopped in the right lane waiting to be escorted through the construction zone by a pilot car. Those vehicles had been stopped by a single flagman positioned at the entrance to the construction zone two to three hundred feet beyond the flashing arrow sign. After stopping the first vehicle to arrive at the pilot car waiting area, he then proceeded to work his way back along the queue of vehicles waiting to be escorted through the construction zone. The testimony at trial was conflicting as to the exact position of the flagman at the time the collision occurred. The flagman testified that he was working his way back toward the end of the line of vehicles and was somewhere in the vicinity of a large Greyhound-type bus which was stopped second from the end of the line of vehicles. However, one Bannock witness, Mr. Millard, a laborer-foreman on the job for the contractor, acknowledged that in an earlier deposition he testified that the flagman told him after the accident that at the time of the accident he (the flagman) was "at the beginning of the line of traffic."

Behind the bus was a pickup truck which received the direct impact of the Garrett truck which, with its trailers, had a combined length of 105 feet. The evidence in the record is conflicting as to whether the driver of the Garrett truck applied his brakes or appreciably decelerated prior to the collision. The only person to actually observe the impact was the flagman, Redfield. He testified that he first noticed the Garrett truck approaching the line of stopped vehicles when it was approximately 100 yards from where he was standing which was approximately at the middle of the stopped Greyhound-type bus. At the time, he estimated the Garrett truck's speed to be between 50 and 60 m.p.h. He testified that the Garrett truck did not slow down prior to impacting into the back of the pickup truck which was stopped behind the bus. The tachometer recorder in the truck disclosed little or no slowing prior to impact. Garrett's accident reconstruction expert, Mr. Schmidt, rendered an opinion that from markings on the pavement approximately 100–200 feet before the impact that in his opinion the Garrett truck had applied its brakes, but not with sufficient force to lock the wheels. It was his opinion that the Garrett truck was traveling at approximately 45–50 m.p.h. at the time of impact and that there was no evidence that the Garrett truck driver had taken any evasive action to avoid the collision. Mr. Schmidt further testified that at the time of the accident the sun would have been reflecting off the aluminum finish of the bus, making it highly visible to approaching vehicles.

## II

Given the above facts we find, as a matter of law, that no reasonable jury could have found, as the jury in the present case found, that the negligence of Bannock was equal to the negligence of the Garrett

truck driver.[1] Even construing the evidence in favor of Garrett, the only possible evidence of Bannock's negligence is that the "Prepare to Stop" and "Flagman Ahead" signs on the left side of the westbound lanes were down sometime after the accident and that the flagman was not properly positioned at the time the accident occurred. Such evidence is substantial competent evidence to support a jury finding that the negligence of Bannock was a causative factor, at least in part, in bringing about the collision. However, that negligence as a causative factor is minimal when contrasted with the fact that the Garrett driver traveled through over a mile and a half of warning signs and then drove directly into a line of six stopped vehicles without appreciably slowing down or swerving to avoid the collision. In other words, the jury's finding that the negligence of Bannock was equal to that of the Garrett truck driver is against the great weight of the evidence and cannot be sustained on appeal.

The testimony of the Garrett Freightlines safety supervisor, a witness called by respondents, indicated that the mile and a half of warning signs, and indeed even the very first warning sign, "Road Construction Ahead," should have alerted Garrett drivers and, indeed, all motorists to reduce their speed and be on the alert. Yet, the evidence is unrefuted that the Garrett driver traveled through a mile and a half of warning devices and, without slowing down, drove his truck into the rear of a line of stopped vehicles which were visible for a considerable distance, especially given the size and reflective color of the bus which was the second to last vehicle in the line. Garrett's accident reconstruction expert testified that the Garrett driver, even in the absence of any of the warning devices, could have clearly seen the stopped line of vehicles directly in front of him.

It is a well settled law in this jurisdiction that a person operating a motor vehicle has a duty to keep a proper lookout. *Robinson v. Westover*, 101 Idaho 766, 768, 620 P.2d 1096, 1098 (1980).

" 'It is not only the duty of the operator to look, but it is his duty to see and be cognizant of that which is plainly visible or obviously apparent, and the failure on his part in this regard, without proper justification or reason, makes him chargeable for failure to see what he should have seen had he been in the exercise of reasonable care.' " *Id., quoting Drury v. Palmer*, 84 Idaho 558, 564, 375 P.2d 125, 128 (1962).

As noted by Justice Bistline in his special concurring opinion in *Robinson*, "Cases are legion that it is negligence *per se* for a driver to fail to see that which is plainly there to be seen." 101 Idaho at 771, 620 P.2d at 1101. One such case is our decision in *Munson v. State Dept. of Highways*, 96 Idaho 529, 531 P.2d 1174 (1975). In *Munson*, the Court held that the driver of a vehicle is held to have notice of that which is plainly visible on the highway before him and that cars stopped on the state highway give as much notice of the blockage to the highway as do warning signs. Indeed, the facts of the present case are even more compelling than those found in *Munson*. In *Munson* the Court held that a single stopped vehicle was adequate notice to a driver that the highway was blocked and that his failure to notice and then avoid a rear end collision with that single stopped vehicle, in comparison to failure to adequately sign the construction site, was the only proximate cause of such a rear end collision.

█ Failure to maintain warning signs in proper location to the construction site may be a proximate cause of a rear end collision at that site; nevertheless, we deem it clear, upon a review of this record, that the bulk of cause for the accident in question lies

---

1. We note that if this were a tort action (instead of an action for contribution) brought by Garrett or by Mr. Russell's spouse to recover damages suffered as a result of Bannock's negligence, the jury's verdict of 30% fault to Bannock, 30% fault to Garrett, and 40% fault to the state would operate to preclude Garrett or Russell's spouse from recovering any of their damages from Bannock under our comparative negligence law. I.C. § 6–801; *Odenwalt v. Zaring*, 102 Idaho 1, 624 P.2d 383 (1980).

with the Garrett truck driver. *Munson v. State Dept. of Highways, supra.* Indeed, all evidence in the record points to the fact that the Garrett driver was driving at a speed in excess of that which was reasonable and prudent under the conditions then existing on the highway and that he failed to maintain any lookout for "that which is plainly there to be seen." 101 Idaho at 771, 620 P.2d at 1101. The Garrett driver's actions in this regard alone are sufficient to support a finding of negligence *per se* on his part. I.C. § 49–681; *Robinson v. Westover, supra; Johnson v. Emerson,* 103 Idaho 350, 647 P.2d 806 (Ct.App.1982).[2] Our conclusion comports with the statement of Garrett's attorney during his closing argument to the jury that his client's negligence was in the area of 50–60%. The trial judge himself, after the jury returned its verdict, indicated that "[h]ad I been the trier of fact I would have found the state 10% negligent, Bannock 15% negligent, and Garrett 75% negligent."

We conclude that no reasonable jury could have reached a conclusion that the negligence of Bannock was equal to that of the negligence of the Garrett truck driver. Whatever percentage of negligence may be attributed to Bannock, it must in comparison to the negligence of the Garrett truck driver be considerably less. Because the jury's verdict in the present case was against the great weight of the evidence, the trial court erred in denying Bannock's motion for new trial. I.R.C.P. 59(a)(6), *Quick v. Crane,* 111 Idaho 759, 727 P.2d 1187 (1986). As we stated in *Blaine v. Byers,* 91 Idaho 665, 429 P.2d 397 (1967), a new trial is in order whenever "the [jury's] verdict is not supported by, or is contrary to the evidence, or ... [it] is not in accord with the clear weight of the evidence and ... the ends of justice would be subserved by vacating it, or when the verdict is not in accord with either law or justice." *Id.* at 671, 429 P.2d at 403. Accordingly, we reverse the judgment and remand for a new trial. *Quick v. Crane, supra; Blaine v. Byers, supra;* I.R.C.P. 59(a)(6). *Accord Dinneen v. Finch,* 100 Idaho 620, 626–27, 603 P.2d 575, 581–82 (1979); *Rosenberg v. Toetly,* 94 Idaho 413, 489 P.2d 446 (1971).

### III

Since we are remanding to the district court for new trial, it is appropriate for us to "pass upon and determine all the questions of law involved in the case presented upon ... appeal, and necessary to the final determination of the case." I.C. § 1–205. By way of instruction on remand, we address two of the issues raised by Bannock in its appeal.

### A.

Bannock requested an instruction concerning its common law immunity as a public works contractor. The trial court rejected the requested instruction on grounds that the immunity was not available because the construction project had not been completed and turned over to and accepted by the state, and because there was some evidence of "active" negligence on the part of Bannock. It was error for the trial court not to give Bannock's requested instruction on its common law immunity.

Litigants have a right to have the jury instructed on every reasonable theory presenting a basis of a claim or relief, or

---

**2.** Our holding that the Garrett truck driver bears the bulk of the responsibility for the accident in question is in harmony with our line of cases that the operator of a motor vehicle must proceed at such a rate of speed that he may be able ordinarily to stop short of an object appearing in the radius of his lights and that he must see an object that an ordinarily prudent driver under like circumstances would have seen. *Maier v. Minidoka County Motor Co.,* 61 Idaho 642, 105 P.2d 1076 (1940). *Accord Van v. Union Pacific RR Co.,* 83 Idaho 539, 366 P.2d 837 (1962); *Johnston v. Pierce Packing Co.,* 550 F.2d 474 (9th Cir.1977). That line of cases, in combination with the provision of I.C. § 49–681 that "[n]o person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual potential hazards then existing," clearly supports the conclusion that the Garrett driver, in failing to observe that which was plainly visible in front of him and to drive his vehicle so as to be able to stop within a safe distance of objects clearly visible in front of him, was negligent and that such negligence must be viewed as the primary causative factor in bringing about the accident in question.

defense thereto, where such theory finds support in the pleadings and evidence. *Messmer v. Ker*, 96 Idaho 75, 524 P.2d 536 (1974); *Rosenberg v. Toetly*, 94 Idaho 413, 489 P.2d 446 (1971); *Hodge v. Borden*, 91 Idaho 125, 417 P.2d 75 (1966); *Domingo v. Phillips*, 87 Idaho 55, 390 P.2d 297 (1964); *Jones v. Mikesh*, 60 Idaho 680, 95 P.2d 575 (1939). Failure to instruct upon a party's theory of the case constitutes reversible error. *Sulik v. Central Valley Farms, Inc.*, 95 Idaho 826, 521 P.2d 144 (1974); *Messmer v. Ker, supra*. We conclude, upon our review of the evidence, that Bannock was entitled to an instruction concerning its common law immunity as a public works contractor.

The rationale underlying the common law immunity of a public works contractor is that the contractor should not be held responsible for defects in design or contract specifications to which he is held in performing the construction contract. As we stated in *Black v. Peter Kiewit Sons' Co.*, 94 Idaho 755, 497 P.2d 1056 (1972):

"A contractor is required to follow the plans and specifications and when he does so, he cannot be held to guarantee that the work performed as required by his contract will be free from defects, or withstand the action of the elements, or that the complete job will accomplish the purpose intended. He is only responsible for improper workmanship or other faults, or defects resulting from his failure to perform." 94 Idaho at 757, 497 P.2d at 1058.

When Bannock executed the public works contract with the State of Idaho it obligated itself to perform that contract according to the specifications promulgated by the transportation department, including the traffic control system designed into the contract by the state. To require a public works contractor, under penalty of being held negligent, to contradict or refuse to perform some or all of the contract specifications which it is obligated by contract law to perform, would introduce irreconcilable conflicts into the public contracting process and would frustrate the construction of public works. The immunity granted a public works contractor, if he performs the contract according to the plans and specifications, is intended to avoid the disruption in the public works contracting process which would result if no such immunity existed. If the contractor performs according to the plans and specifications, the sole responsibility for design defects lies with the state. *Green v. Bannock Paving Co.*, 111 Idaho 3, 720 P.2d 186 (1986); *Elce v. State*, 110 Idaho 361, 716 P.2d 505 (1986); *Black v. Peter Kiewit Sons' Co.*, 94 Idaho 755, 497 P.2d 1056 (1972); *Gates v. Pickett & Nelson Construction Co.*, 91 Idaho 836, 432 P.2d 780 (1967); *Puget Sound Nat'l Bank v. C.B. Lauch Constr. Co.*, 73 Idaho 68, 245 P.2d 800 (1952).

█ Furthermore, the rationale underlying the immunity is not dependent upon whether the work is complete or ongoing. There is no basis in reason or in our case law for distinguishing, insofar as the immunity is concerned, between cases where the work is complete and accepted by the state or where it is still ongoing. In either event, the contractor is bound by the terms of the public works contract and must perform according to those terms. In the recent case of *Elce v. State*, 110 Idaho 361, 716 P.2d 505 (1986), we specifically upheld the public works contractor's common law immunity where the construction project itself was still ongoing at the time the accident and injuries occurred in that case. In *Elce*, as in the present case, one of the allegations of negligence was that the signing package installed by Western Construction, the contractor, failed to adequately warn motorists of an alleged hazard or dangerous ongoing condition created by Western. The decision and rationale in *Elce* is controlling and directly applicable to the present case.[3] We note that the

---

3. To accept the district court's position, and the position urged by respondents on appeal, that a public works contractor is entitled to immunity only for projects which are completed and accepted by the state would, under the facts of the present case, be tantamount to holding that the immunity does not apply when the defect concerns an adequate signing package. Presumably allegations of negligence in traffic control only arise when a construction project is still

district court in the present case was without the benefit of our decision in *Elce* when ruling on Bannock's requested jury instruction concerning its common law immunity.

The other basis relied on by the district court for refusing Bannock's request to have the jury instructed concerning its common law immunity was that Bannock may have been "actively" negligent. We interpret the word "active" as used by the district court to mean some negligent act other than Bannock's conduct in performing the traffic control plan as designed by the state. The evidence was conflicting as to whether Bannock had committed some independent tortious act apart from implementing the state's traffic control plan. However, Bannock was entitled to have the jury instructed with the instruction which we approved in *Green v. Bannock Paving Co.*, 111 Idaho 3, 720 P.2d 186 (1986), regarding its common law immunity based upon its evidence in the record that its implementation of the traffic control plan was in substantial conformance with the plan's requirements. In *Green*, this Court stated that while "[t]he trial court correctly instructed the jury of the general rule that a highway contractor has a duty to use ordinary care in the performance of the contract ... (Citations omitted) [i]t also correctly instructed the jury of the more specific rule, cited above, that a public works contractor, who has performed its work in accordance with the State's plans and specifications, is not liable for any damages resulting therefrom." 111 Idaho at 6, 720 P.2d at 189.[4] Even if it were uncontradicted that Bannock was "actively" negligent, *i.e.*, had committed negligent acts not in conformance with the state's traffic control plan, it nevertheless would still be entitled to have the jury instructed that any finding of negligence must be based upon such independent tortious conduct and not upon any alleged failure of Bannock to correct defects in the state's traffic control plan. *Green v. Bannock Paving Co., supra.*

### B.

Bannock also alleges that the trial court erred in permitting Garrett's accident reconstruction expert to render an expert opinion concerning whether the state's traffic control plan, as designed, complied with industry standards as set forth in the Manual on Uniform Traffic Control Devices (MUTCD). While allegations of negligence concerning the traffic control plan (*i.e.*, that it was inadequate or did not conform with industry standards) is an issue relating solely to the negligence of the state, we nevertheless deem it appropriate to address the issue since in a new trial the state's comparative negligence will be an issue. *Vannoy v. Uniroyal Tire Co.*, 111 Idaho 536, 726 P.2d 648 (1986).

After a review of the foundation evidence in the record regarding witness

---

ongoing. Once the project is complete the traffic control devices (signs, barricades, flagmen, etc.) are removed. The contractor is off the job and no grounds would exist for asserting negligence on his part insofar as traffic control during the construction project is concerned. In short, the immunity defense would be meaningless. Respondents' argument, in essence, is that an exception to the immunity doctrine should be carved out whenever the allegations of negligence concern adequate warning of motorists. We find no support in case law for such an exception, and respondents have not provided us with any. Indeed, our holding in *Elce* is directly contrary to the argument asserted by respondents. Again, we find no support in our case law or as a matter of policy for making such a distinction. A public works contractor is entitled to immunity so long as he performs in accordance with the contract specifications by which he is bound. It makes no difference whether that performance is judged in light of an ongoing project or one which has been completed and accepted by the state.

4. The instruction which the Court reviewed in *Green* reads as follows:

"A highway contractor is not liable to third persons for damages or injuries subsequently suffered by reason of the condition of the work where the contractor performed the work in strict accordance with the terms of the contract, or performed the work according to the plan and specifications furnished by the State. Because a highway contractor is required to follow the plans and specifications, that contractor cannot be held to guarantee that the work performed as required by the contract will be free from defects, or withstand the action of the elements, or that the completed job will accomplish the purposes intended."

Schmidt's qualifications, we hold it was error for the trial court to permit Schmidt to testify whether the traffic control plan for the construction project complied with the MUTCD. The manual itself states that application of its provisions to a specific construction project requires the exercise of independent engineering judgment. Mr. Schmidt was not a licensed engineer and, by his own admission, had no engineering training. The evidence in the record discloses that Schmidt was experienced in accident reconstruction. He had no training or experience in traffic control and safety design. Furthermore, we note that the evidence is uncontroverted to the effect that Mr. Schmidt, at the time he formed his opinion concerning whether the sign package complied with the requirements of the MUTCD, and even as late as the time of his testimony at trial, had not obtained and reviewed a copy of the manual containing the provisions in effect at the time the sign package was designed in the present case. Under the rules of evidence now in effect, such a lack of knowledge of foundational materials upon which an expert is expressing an opinion would render the expert's opinion testimony inadmissible. I.R.E. 602, 703. In the event retrial is had and Mr. Schmidt is called as an expert witness, he should not be permitted to testify concerning whether the traffic control plan as designed by the state met the requirements of the MUTCD.

However, should Mr. Schmidt testify on retrial, his expertise is sufficient to qualify him to express an opinion, as he did in the present case, concerning the dynamics of the collision and the effect it had upon the vehicles involved and upon their occupants. His qualifications would also permit him to testify concerning the environment in which the accident took place, i.e., conditions of the road and the general driving environment which motorists encountered on that stretch of the Interstate, including the signing package. His qualifications would permit him to express an opinion as to whether the signs used in the traffic control plan and their placement contributed to, or were a causative factor of the accident. However, based on the foundation laid at the last trial, he was not qualified to express an expert opinion as to whether the signing package as designed complied with the requirements of the MUTCD. Compliance with the MUTCD in the design phase, and any issue regarding whether the signs were a causative factor in bringing about the accident, are two separate and distinct issues. It is one thing to express an opinion that the signing package as designed by the state and implemented by Bannock failed to adequately warn the traveling public and thus constituted a causative factor in bringing about the accident, and another thing to testify that the sign package as designed failed to comply with industry standards. In the absence of further foundation evidence regarding additional expert qualifications, Mr. Schmidt should only be permitted to testify concerning causative factors.

The verdict of the jury apportioning fault among Garrett, Bannock and the State of Idaho and the district court's judgment entered thereon are reversed and the case remanded for a new trial. Costs to appellants. No attorney fees allowed to any party on appeal.

SHEPARD, C.J., and DONALDSON, BISTLINE and HUNTLEY, JJ., concur.