# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47194

SRM ARMS, INC.,

    Plaintiff-Appellant-Cross Respondent,

v.

GSA DIRECT, LLC; FFL DESIGN, LLC;

    Defendants-Respondents-Cross Appellants,

and

ANTHONY SCOTT TURLINGTON; DAVID LEHMAN; RYAN FITZGERALD; MILTAC INDUSTRIES, LLC, an Idaho limited liability company; PRIMUS TECHNOLOGY SOLUTIONS, LLC, an Idaho limited liability company; GOL, LLC, a Nevada limited liability company,

    Defendants-Respondents.
_____

GSA DIRECT, LLC,

    Counterclaimant-Respondent-Cross Appellant,

v.

SRM ARMS, INC.,

    Counterdefendant-Appellant-Cross Respondent,

and

SNAKE RIVER MACHINE, INC.; SRM

PERFORMANCE PRODUCTS; and JEFF HAJJAR,

    Counterdefendants-Third Party Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, February 2021 Term

Opinion filed: August 4, 2021

Melanie Gagnepain, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Gerald F. Schroeder, Senior District Judge.

The judgment of the district court is <u>affirmed in part</u> and <u>reversed in part</u>.

David V. Nielsen, Attorney at Law, Boise, and The Pels Law Firm, Bethesda, Maryland, for Appellants-Cross Respondents. Jon D. Pels argued.

James R. Donoval, Eagle, for Respondents-Cross Appellants GSA Direct, LLC; FFL Design, LLC; Miltac Industries, LLC; Primus Technology, LLC; and GOL, LLC. James R. Donoval argued.

Angstman Johnson, Boise, for Respondents-Cross Appellants Anthony Scott Turlington; David Lehman; and Ryan Fitzgerald. Matthew Christensen argued.

MOELLER, Justice

In this appeal we address the aftermath of an informal business arrangement gone sour, and the resulting trial in which the presiding judge modified the jury's verdicts. SRM Arms, Inc., ("SRM") filed suit against GSA Direct, LLC, ("GSA") and FFL Design, LLC, ("FFL") (collectively, the "Entity Defendants"), and Anthony Scott Turlington ("Turlington"), David Lehman ("Lehman"), and Ryan Fitzgerald ("Fitzgerald") (collectively the "Individual Defendants"), alleging breach of contract, breach of the covenant of good faith and fair dealing, fraud, aiding and abetting in the commission of fraud, and unjust enrichment.

After the jury awarded verdicts for SRM, which the district court calculated as totaling $1,110,695, the Entity Defendants and the Individual Defendants asked the court to modify the judgments or grant a new trial. The district court entered a remittitur[1] for the claims against the Entity Defendants because it found the amount the jury awarded was excessive and not supported by sufficient evidence at trial. On appeal, SRM argues the district court erred in reducing the awarded damages. In their cross-appeal, the Entity Defendants argue the jury improperly found fraud and improperly found FFL liable for GSA's debts. The Entity Defendants also argue the damages should have been reduced further.

Additionally, the district court granted the Individual Defendants' motion for a new trial on liability and damages because it found the jury instructions were inadequate to distinguish between direct liability and alter-ego liability. On appeal, SRM argues the jury correctly determined direct liability and associated damages. All parties seek attorney fees and costs.

---

[1] An order whereby the trial judge reduces the damages awarded by a jury in its verdict. *See* I.R.C.P. 59.1.

# I.     FACTUAL AND PROCEDURAL BACKGROUND

## A.  Factual Background

SRM Arms is a manufacturer of firearms specializing in a unique semi-automatic shotgun designed by its CEO. On January 25, 2011, SRM signed a scant half-page business agreement with GSA Direct to be the "Authorized Distributor" for SRM's products. This entitled GSA to a 35% discount from the list price of the products it sold to firearms merchants. GSA also sold SRM's firearms and accessories to merchants through its affiliated distributors, including FFL Design, LLC, (Delaware) and FFL Design, LLC, (Idaho) (collectively "FFL"), which used an online platform called "vArmory" to market and sell SRM's products. The Individual Defendants in the case—Turlington, Lehman, and Fitzgerald—had ownership interests in each of the previously named companies.

No written document set forth the shipping, billing, or payment procedures between SRM and GSA. However, it was generally understood that a firearms merchant would place an order with GSA or one of its affiliates, and GSA would forward the order to SRM. GSA would then take physical possession of the firearm products from SRM at SRM's facilities and ship them to the customer at GSA's expense. After the products had shipped, GSA billed the customer, processed payments, and calculated how much it owed SRM. GSA then issued a purchase order to SRM, which, at the direction of SRM, did not include any serial numbers. GSA delivered purchase orders and payments to SRM in batches, which created delays in the payment schedule. SRM never issued any invoices of its own.

Although there was no formal agreement as to the timeframe in which SRM would be paid, all parties agree that by September 2013, a backlog of payments had developed. GSA conducted its own audit and determined that it owed SRM a balance of $284,145 and SRM agreed. GSA asserted that the backlog developed because SRM was unable to produce shotguns on schedule, which resulted in 747 cancelled orders for shotguns between 2011 and 2016, and that a significant number of the shotguns sold (approximately 19% during the course of SRM and GSA's business relationship) had to be returned for repair or replacement.

SRM and GSA did not make a formal arrangement as to how GSA would pay down its debt. SRM continued to supply GSA with shotguns to sell. By December 2014, GSA had paid the backlog debt down from $284,145 to $189,484. At this point, the debt accounted for about 5% of GSA's total sales ($4,092,773) under its distribution contract with SRM. In spring 2015,

SRM indicated that an additional backlog had accrued since January 2014 of $174,750, though SRM did not provide specifics, such as serial numbers for the guns for which it alleged GSA had yet to pay. Lehman testified at trial that any additional payments owed were not delinquent but only delayed, consistent with the accepted routine for accounts payable. SRM later updated the deficit total for this second time period, from January 2014 through July 2015, to $212,815. GSA disputed this total, and again SRM provided no serial numbers for the guns associated with GSA's alleged debt.

In May 2015, SRM's CEO emailed Turlington and Lehman, asking to discuss the unpaid backlog. Turlington replied to SRM from his FFL email account and copied Lehman at his FFL email address. Turlington offered several solutions for paying off the debt, including finding investors for FFL, which Turlington stated would let them "shift a portion of operations costs from GSA Direct to FFL Designs," and allow them "to begin a steady payment against the backlog" within the next 30 to 60 days. Turlington concluded by reassuring SRM of their intentions:

> Jeff, you have been more than patient with us as we have worked to get this situation fixed. We ask is [sic] that you give us a few more months to pull the plans above into action and this will allow us to take care of the backlog once and for all. If none of these options above work then I think the only logical conclusion would be for us to stop selling the shotgun and go get jobs that will allow us to get the backlog paid. Regardless, there isn't a scenario where we don't get the backlog paid because that is the commitment we've made and will keep.

At trial, Lehman and Turlington stated that FFL was a separate company from GSA; however, SRM maintained it was a subset of GSA and, therefore, liable for GSA's debts. According to SRM, the email from Turlington was written on behalf of GSA members and amounted to both a business guarantee by GSA and FFL as well as a personal guarantee by the Individual Defendants that the loan would be paid. At trial, SRM testified that Lehman, Turlington, and Fitzgerald had also separately made oral promises to personally guarantee the debt, or that FFL would pay the debt. The Individual Defendants all denied this. Instead, each of the Individual Defendants claimed he had told SRM's CEO that once FFL was funded by investors, GSA would have lower overhead costs and would better be able to pay the backlog debt. After SRM alerted GSA to its concerns about the backlog of payments, SRM continued to supply GSA with shotguns.

In 2016, FFL began selling SRM shotguns with an additional 13.5% service fee through its online platform, vArmory. FFL would then pay GSA, and GSA would pay SRM its 65% due under the distribution contract. Turlington, Lehman, and SRM came to an oral agreement in late 2015 or early 2016 that once FFL became fully operational, GSA would pay SRM 100% of its sales revenues until the original backlog amount of $189,484 was paid. In May 2016, FFL began dealing directly with SRM to arrange shipment of the shotguns, and FFL would charge the buyer and pay SRM, retaining its service fee and paying SRM the entire remaining balance.

On September 13, 2016, SRM terminated its distribution agreement with GSA, and demanded immediate payment of the backlog debt, which it then calculated to have grown to $422,029. GSA replied through counsel that without SRM's supply of shotguns, which was its sole source of income, it could not repay the debt. In the event this occurred, GSA indicated it would file articles of dissolution, making a lawsuit against GSA fruitless.

## B. Procedural Background

### 1. Jury Trial

At trial, the claims against the Entity Defendants were presented along with the direct liability claims against the Individual Defendants, i.e. the claims against Turlington, Lehman, and Fitzgerald for actions taken in their individual capacities, and *not* for actions taken as proxies of the entities. The district court ordered bifurcation of the claims against the Individual Defendants for actions taken as proxies or alter-egos,[2] to be considered later in a separate bench trial, if necessary.[3] An 11-day jury trial took place in October 2018. The jury returned verdicts against both the Entity Defendants and the Individual Defendants. The jury's special verdict form did not ask the jury to set forth the factual basis for each of the verdicts. The jury submitted the following verdicts in favor of SRM and against GSA:

> (1) Breach of contract: $659,576
> (2) Breach of covenant of good faith and fair dealing: $659,576 "the same"
> (3) Fraud: $659,576 "the same"

The jury entered the following verdicts in favor of SRM and against FFL:

---

[2] The order to bifurcate the trials was entered by Judge Melissa N. Moody. Former Chief Justice Gerald F. Schroeder, sitting as a specially appointed district judge, presided over the first trial and the post-trial proceedings.

[3] The proxy liability claims against the Individual Defendants concern whether SRM can reach the assets of those individuals to collect the damages awarded by the jury against the Entity Defendants, or if assets of those individuals are shielded and the damages can only be collected from the assets of the entities. Thus, the proxy liability claims against the Individual Defendants did not need to be considered unless there was first a finding that the Entity Defendants were liable to SRM.

(1) Breach of implied-in-fact contract: $659,576 "the same"
(2) Unjust enrichment: $42,949
(3) Fraud: $659,576 "the same"
(4) Aiding and abetting in the commission of fraud: $659,576 "the same"

The jury entered the following verdicts in favor of SRM and against the Individual Defendants:

(1) Breach of implied-in-fact contract: $294,356 against Turlington and Lehman; $113,814 against Fitzgerald
(2) Fraud: $294,356 "the same" against Turlington and Lehman
(3) Aiding and abetting in the commission of fraud: $294,356 "the same" against Turlington, Lehman, and Fitzgerald

The district court calculated these combined damages awarded to SRM, including those awarded against GSA, FFL, Turlington, Lehman, and Fitzgerald, as totaling $1,110,695. The jury denied GSA's counterclaim against SRM for breach of contract and breach of covenant of good faith and fair dealing.

### 2. JNOV and New Trial Motions

In November 2018, the Entity Defendants filed a motion for a judgment notwithstanding the verdict ("JNOV") pursuant to I.R.C.P. 50(b), as well as a Motion for a New Trial pursuant to I.R.C.P. 59(a). The district court denied the motion for JNOV. The district court also denied the motion for a new trial as related to the liability of the Entity Defendants. However, the district court reduced the judgment amount for the claims against the Entity Defendants from $659,576 to $422,029 because it found the jury award was not supported by sufficient evidence and entered a remittitur for the reduced amount. The Individual Defendants also filed a motion for JNOV, or in the alternative, Motion for a New Trial. The district court denied the Individual Defendants' motion for JNOV but granted the motion for a new trial with respect to liability and damages.

The Entity Defendants and SRM filed motions for reconsideration, and in September 2019, the district court denied both motions. SRM appealed and the Entity Defendants cross-appealed.

## II. STANDARD OF REVIEW

### A. Remittitur or New Trial for Damages

A remittitur is an alternative to granting a new trial when the presiding judge believes that the jury awarded excessive damages due to passion or prejudice. *Quick v. Crane*, 111 Idaho 759, 770, 727 P.2d 1187, 1198 (1986). It is a highly discretionary decision that, first, requires the

6

trial court to determine whether to grant a new trial based on an excessive award of damages. I.R.C.P. 59(a)(1)(F). To do so, the trial court "*must* weigh the evidence and then compare the jury's award to what he would have given had there been no jury." *Crane*, 111 Idaho at 768, 727 P.2d at 1196 (internal quotations omitted). Because the decision to grant a motion for a remittitur of damages is an alternative to granting a new trial, on review it is due the same exercise of discretion a court has in ruling on a new trial motion under I.R.C.P. 59(a)(1)(F). *Id.* at 770, 727 P.2d at 1198. See also I.C. § 6-807(2) ("the district court may exercise its discretion to reduce or increase such award in order to make the same consistent with the losses as shown by the evidence"). "If the district court decides to reduce the amount of a jury award, it must enter detailed findings of fact and conclusions of law explaining its reasoning and the basis for the reduction." *Litke v. Munkhoff*, 163 Idaho 627, 636, 417 P.3d 224, 233 (2018); I.C. § 6-807(2).

This Court reviews a district court's decision to grant or deny a new trial under an abuse of discretion standard. *Id.* at 632, 417 P.3d at 229 (internal citation omitted). When reviewing the district court's decision for an abuse of discretion, this Court considers whether the district court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life,* 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

We acknowledge that "[t]he trial court is in a far better position to weigh the demeanor, credibility, and testimony of witnesses, and the persuasiveness of all the evidence. Appellate review is necessarily more limited. While we must review the evidence, we are not in a position to 'weigh' it as the trial court can." *Dinneen v. Finch*, 100 Idaho 620, 626, 603 P.2d 575, 581 (1979). However, the trial court's authority on damages is not without limits:

> [S]ince it is a jury function to set the damage award based on its sense of fairness and justice, the trial judge must defer to the jury, *unless* it is apparent to the trial judge that there is a great disparity between the two damage awards and that disparity cannot be explained away as simply the product of two separate entities valuing the proof of the plaintiff's injuries in two equally fair ways.

*Id.* In short, if a trial court's calculated damages award is substantially different from the jury's award, and the trial court cannot attribute the jury's award to an equally fair alternative interpretation of the facts—i.e. the trial court determines the jury's award could only be due to passion or prejudice—then the trial court may order a new trial for damages. *Quick*, 111 Idaho at 769, 727 P.2d at 1197. Our review "primarily focuses on the process by which the district court

7

reached its decision, not on the result of the district court's decision." *Sheridan v. St. Luke's Reg'l Med. Ctr.*, 135 Idaho 775, 780, 25 P.3d 88, 93 (2001).

## B. JNOV

This Court reviews a district court's ruling on a motion for JNOV as if it were a delayed motion for a directed verdict, and is based on a de novo review of the sufficiency of the evidence. *Olson v. EG&G Idaho, Inc.*, 134 Idaho 778, 781, 9 P.3d 1244, 1247 (2000). Thus, this Court determines:

> whether there was sufficient evidence to justify submitting the claim to the jury, viewing as true all adverse evidence and drawing every legitimate inference in favor of the party opposing the motion for a directed verdict. This test does not require the evidence be uncontradicted, but only that it be of sufficient quantity and probative value that reasonable minds could conclude that a verdict in favor of the party against whom the motion is made is proper. Where a non-moving party produces sufficient evidence from which reasonable minds could find in its favor, a motion for directed verdict should be denied.

*April Beguesse, Inc. v. Rammell*, 156 Idaho 500, 509, 328 P.3d 480, 489 (2014) (quoting *Enriquez v. Idaho Power Co.*, 152 Idaho 562, 565, 272 P.3d 534, 537 (2012)).

## III. ANALYSIS

The parties raise a number of issues for review by this Court, but each poses a similar difficulty: the special verdict form given to the jury did not as ask the jury to provide the factual bases for the verdicts. Yet, it is mainly the jury's factual findings which support its verdicts that give rise to the issues raised on appeal. Under an abuse of discretion standard, this means we must first determine whether the district court properly divined the jury's reasoning, and then second, whether the district court abused its discretion in responding to that reasoning. Reviewing the district court's JNOV rulings requires similar mental gymnastics—i.e., we must attempt to deduce what evidence the jury might have relied upon, draw all legitimate inferences in favor of the party opposing the motion, and then determine whether that evidence was sufficient for a reasonable jury to have reached that verdict.

For some issues, the factual groundwork underlying the jury's decisions appears somewhat self-evident, and the district court's discussion of the jury's reasoning can be reviewed under the applicable standard. However, other issues require impermissible guesswork and cannot satisfy the standard of review. We address each issue accordingly.

**A. The district court erred by concluding that the jury's award of damages to the Entity Defendants was solely due to passion or prejudice without considering an alternate basis for the jury's award.**

The district court entered a remittitur reducing the jury's awarded damages against the Entity Defendants from $659,576 to $422,029. On appeal, we consider whether the district court made sufficient factual findings to support reducing the damages awarded by the jury. Specifically, we must determine whether the district court erred in concluding that the substantial difference in damages awarded to the Entity defendants between the jury's verdict and the district court's own calculation was attributable only to the jury's passion or prejudice. *See Quick*, 111 Idaho at 769, 727 P.2d at 1197. For the reasons set forth below, we conclude that the district court failed to "reach its decision by the exercise of reason" by not considering a possible justification for the jury's verdict. *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194. Accordingly, we remand for reconsideration of the motion for remittitur and the motion for new trial.

The district court based its decision to reduce the amount of damages awarded against the Entity Defendants on its inability to determine how the jury could have arrived at the specific monetary amount for the breached contract. Moreover, the district court found troubling that the combined damages awarded against both the Entity and the Individual Defendants—as calculated by the district court at $1,110,695—appeared to exceed even the highest amount requested by SRM. According to the district court, the trial record did not support such a hefty award, indicating that passion or prejudice was the driving force behind the jury's calculation of the damages.

For example, when the parties acknowledged there was an initial backlog of payments owed, GSA and SRM reached an understanding that the amount due was $189,484. However, at trial, SRM's expert witness opined that this initial figure should have been larger. Thus, the expert's calculation of damages against GSA included a recalculation of the initial backlog as well an assessment of the backlog that accrued thereafter. The district court disagreed with the expert's recalculation of the initial backlog, writing, "Considering the lack of precision in the parties [sic] record keeping, it is unrealistic to say that more was owed at the earlier date than the amount to which the parties had agreed and relied upon."

Later, in a 2016 expense report, SRM then recorded the total outstanding balance at $422,029. SRM's expert witness recalculated these damages at a figure somewhere between $715,033 and $891,449. Again, the district court stated that it did not accept the validity of the

9

expert's analysis—and that it believed the jury had not accepted it either. Beyond the expert's rejection of the agreed upon amount of the initial backlog at $189,484, the district court also found problematic that the expert relied on GSA's tax worksheets rather than its actual filed tax returns. Thus, there was little concrete evidence to support the argument that more damages were owed than the figure the parties had originally agreed upon: $422,029. The district court also noted that the difficulty in assessing damages was compounded by credibility problems on both sides. SRM's CEO "claimed substantial personal expenses as business expenses and nearly doubled his claim for damages from what he asserted before trial." GSA kept poor records regarding what it owed and "[took] on some responsibilities without complaint and subsequently [denied] they were GSA Arms [sic] responsibilities." The result, according to the district court, was that no figure seemed credible except the $422,029 the parties had once agreed was owed. Because the district court could not find any way to show that the Entity Defendants' breach of contract with SRM could have resulted mathematically in the amount of damages awarded against the Entity Defendants by the jury ($659,576), the district court found the award amount was based on insufficient evidence and must have been due to passion or prejudice.

We acknowledge at the outset that it is within the boundaries of a trial court's discretion to weigh the validity of an expert's testimony when considering a motion for a new trial. *See Ellefson v. Palmer*, 162 Idaho 393, 398, 397 P.3d 1152, 1157 (2017) (citing *Sheridan*, 135 Idaho at 781, 25 P.3d at 94 (holding that a court's "determination to discount the testimony of the defendant's expert witnesses was a proper exercise of his discretion in weighing the demeanor, credibility and persuasiveness of the evidence" when ruling on a motion for a new trial)); *Collins v. Jones*, 131 Idaho 556, 558, 961 P.2d 647, 649 (1998) ("It is the trial court's duty to weigh the evidence and make an assessment of the credibility and weight of that evidence."). Nonetheless, in order for us to uphold the district court's reduced damages award, the record must make clear the jury could not have arrived at its award except by passion or prejudice. *Id.* at 769, 727 P.2d at 1191. We do not find this to be the case.

We conclude that the district court abused its discretion by failing to "reach its decision by exercise of reason." *See Lunneborg* 163 Idaho at 863, 421 P.3d at 194. The record suggests that in its attempt to reconstruct the jury's award of damages, the district court may have misinterpreted the causes of action for which the jury awarded damages against the Entity Defendants. Further, the district court may have misapprehended the total combined amount of

10

damages the jury intended to award against the Entity and the Individual Defendants. In short, the district court took issue with what it perceived to be combined damages totaling $1,110,695—an award in excess of anything SRM had requested. However, as we will explain below, the record suggests that the jury may have intended to award only around $702,525 in combined damages.

First, we address whether the jury could reasonably have awarded $702,525 against the Entity Defendants. Again, as with most of the issues in this appeal, the difficulty arises from the special verdict form, which set forth the damages awarded against the Entity Defendants as follows:

Against GSA:

> (1) Breach of contract: $659,576
> (2) Breach of covenant of good faith and fair dealing: $659,576 "the same"
> (3) Fraud: $659,576 "the same"

Against FFL:

> (5) Breach of implied-in-fact contract: $659,576 "the same"
> (6) Unjust enrichment: $42,949
> (7) Fraud: $659,576 "the same"
> (8) Aiding and abetting: $659,576 "the same"

We interpret this as the jury intending to enter "the same" damages—i.e. combined damages—of $659,576 for seven of the eight causes of action, and then an additional $42,949 for the unjust enrichment claim against FFL. This means the total damages awarded against the Entity Defendants was a combined $702,525 for *all* of the causes of action for which the jury found GSA and FFL liable.

The district court's remittitur order, however, addressed only whether the jury could have awarded $659,576 based on the *breach of contract*. The district court argued convincingly that the testimony by SRM's expert was not a sufficient basis for awarding more than the $422,029 the Entity Defendants and SRM had, at one time, agreed was owed on the contract. Yet, nothing in the special verdict form convinces us that it was reasonable for the district court to interpret that the jury *did* award more than $422,029 for the breach of contract claim. In other words, the $659,576 appears to be awarded for seven distinct causes of action, which *together* totaled the amount in question. In order to find that the award amount was due to passion or prejudice, the district court needed to make findings of fact and conclusions of law to support a determination

11

that the amount for the *combined* causes of action was due to passion or prejudice. *See* I.C. § 6-807(2). Because the special verdict form does not delineate separate amounts awarded for each cause of action, the more likely interpretation of the award is that the damage total is larger than $422,029 because the jury intended to include in its award the damages from the *other* causes of action against the Entity Defendants. If we were to affirm the district court's remittitur, we would have to simply assume that *any* jury award of damages based on the other causes of action was due to passion or prejudice. Further, SRM would have to forego damages on a number of claims where the jury found the Entity Defendants liable. We cannot agree that this outcome would be reasonable based on the district court's analysis of a single cause of action.

We note a similar lack of support in the record for the district court's contention that the award must have been due to passion or prejudice because it could not replicate the jury's math in order to arrive at a combined damages total against both Entity and Individual Defendants of $1,110,695. Again, we look at the confusion sown by the format of the special verdict form. We consider the description of the damages awarded against the Individual Defendants, not in terms of the validity of those damages (which is addressed elsewhere in this opinion), but to better understand whether the *total* damages the jury intended to award against both the Entity and the Individual Defendants was sufficient evidence of passion or prejudice by the jury. The special verdict form recorded the following damages against the Individual Defendants:

Against Each of the Individual Defendants:

(1) Breach of implied-in-fact contract: $294,356 against Turlington and Lehman; $113,814 against Fitzgerald
(2) Fraud: $294,356 "the same" against Turlington and Lehman
(3) Aiding and abetting: $294,356 "the same" against Turlington, Lehman, and Fitzgerald

The district court appears to have interpreted these amounts and the use of the words "the same" to conclude that the jury awarded the following total damages against each named defendant:

(1) Against Turlington and Lehman, a shared $294,356

(2) Against Fitzgerald, $113,814

According to the district court's interpretation, Turlington and Lehman share liability for the $294,356 award. However, it is also possible that the jury's response on the special verdict form

12

instead concludes that Turlington and Lehman are liable for $294,356 *each*. Thus, the jury may have intended that the damages owed by each of the named defendants would be as follows:

(1)  Against Turlington, $294,356

(2)  Against Lehman, $294,356

(3)  Against Fitzgerald, $113,814

Significantly, this would yield a total damages award against the Individual Defendants of $702,526. In other words, the total damages awarded against the Individual Defendants would be only one dollar different from the total damages of $702,525 actually awarded against the Entity Defendants—a difference of 0.00014 percent—making it highly unlikely that this is a mere coincidence. This analysis contradicts the district court's conclusion that the jury appeared to have simply picked an inflated damage amount out of thin air. Further, it is possible the jury may have determined the overall damages SRM was owed, and then intended that *either* the Entity Defendants *or* the Individual Defendants should be liable for that total amount. In that case, the jury's award would not have totaled the $1,110,695 in total damages the district court found so troubling; instead, it may represent a single combined award of $702,525.

We acknowledge the difficult challenge a trial court faces when attempting to reverse engineer a jury's verdict, especially in a case with as many variables as this one. Nevertheless, we cannot find support for the district court's remittitur without a full analysis of all the possible interpretations of the jury verdict form because those interpretations may not support a finding of passion or prejudice. Importantly, although we have offered a variety of explanations for the damages awarded by the jury, the district court remains in a better position to answer the questions we have raised here, specifically: (1) how the jury's award relates to seven of the eight causes of action against the Entity Defendants, which the district court did not previously address, (2) whether the jury intended for the damages to be payable *either* by the Entity Defendants or the Individual Defendants, or that they should *each* pay that total, and (3) in light of these questions, whether the special verdict form was simply inadequate to support *any* result, thus necessitating a new trial. Accordingly, we remand the case to the district court for reconsideration of the motion for new trial or remittitur. Because the district court will reconsider the remittitur issue, we need not address the Entity Defendants' cross appeal arguing that the $422,029 remittitur should have been reduced further.

13

**B. The remaining verdicts against the Entity Defendants are affirmed in part and reversed in part.**

The Entity Defendants appeal the jury verdicts of fraud, as found against GSA and FFL; liability, as found against FFL; and unjust enrichment, as found against FFL. "This Court will not overturn a jury verdict if it is supported by substantial and competent evidence." *Vanderford Co. v. Knudson,* 144 Idaho 547, 552, 165 P.3d 261, 266 (2007). The substantial evidence standard "does not require that the evidence be uncontradicted, or even that we find it persuasive." *Inv'r Recovery Fund, LLC v. Hopkins*, 167 Idaho 42, 467 P.3d 406, 412 (2020). Nor does it require this Court to reweigh the evidence. *Id.* Instead, a finding of substantial evidence only requires us to determine whether "the evidence [is] of sufficient quality and probative value that reasonable minds could conclude that a verdict in favor of the party against whom the motion is made is proper." *Id.* (quoting *Gillingham Const., Inc. v. Newby-Wiggins Const., Inc.*, 136 Idaho 887, 892, 42 P.3d 680, 685 (2002)). "When reviewing a jury verdict on appeal the evidence adduced at trial is construed in a light most favorable to the party who prevailed at trial." *Garrett Freightlines, Inc. v. Bannock Paving Co.,* 112 Idaho 722, 726, 735 P.2d 1033, 1037 (1987).

Notably, the district court acknowledged that it did not have access to a transcript of the trial when it ruled on the post-trial motions. However, the district court not only had the opportunity to personally observe the tone and demeanor of the witnesses at trial; it also had access to its own trial notes and the admitted exhibits in deciding the post-trial motions.

**1. The jury's finding of fraud against the Entity Defendants is supported by substantial and competent evidence.**

To establish fraud, nine elements must be proven at trial by clear and convincing evidence: "(1) a statement of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent to induce reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) the hearer's right to rely; and (9) consequent and proximate injury." *Country Cove Dev., Inc. v. May*, 143 Idaho 595, 600, 150 P.3d 288, 293 (2006). This Court reviews whether the jury reached its verdict based on substantial and competent evidence. *Vanderford Co.* 144 Idaho at 552, 165 P.3d at 266.

In its Third Amended Complaint, SRM alleged three separate theories for its fraud claims against the Entity Defendants. First, that GSA and FFL created false purchase orders. Second, that GSA and FFL improperly recorded the transfer of firearms from SRM to GSA. Third, that

14

GSA promised to pay any accounts receivable by contributing a portion of future sales revenues to SRM, and in each instance it did not intend to do so. The jury found both GSA and FFL had committed fraud against SRM, but the jury's special verdict form did not indicate which of the three theories it relied on for its finding of fraud. The Entity Defendants assert that because SRM cannot specify which statement of fact formed the basis of the jury's finding of fraud under any of the three theories, the fraud verdict must be set aside.

We must determine whether there was substantial evidence submitted to the jury to support a finding of fraud—i.e., whether there was evidence of sufficient quality and probative value that reasonable minds could conclude that a qualifying statement of fact existed to form the basis of a fraud claim under any one of the three fraud theories asserted by SRM. The district court stated the following as to the fraud claim in its opinion following The Entity Defendants' motion for JNOV[4]:

> There is evidence that GSA Direct did not pay the amounts due SRM Arms within any reasonable time, despite numerous promises to do so. Two factors in the court's analysis support the jury's finding beyond the basic fact of non-payment. The jury could take into account that many of the records of SRM Arms were actually kept by a representative of GSA Direct from which inferences could be drawn as to the reliability or completeness of the records. Additionally, the jury might see the withdrawal of GSA Direct from the business and replacement by FFL Design as an attempt to avoid liability. The sense of that transfer is not self-evident and could have been viewed by the jury as part of a scheme to shield GSA Direct from a duty to pay what was due.

The Entity Defendants assert that Idaho law does not allow a party to be held liable for fraud based on the promise of a future occurrence—here, future payment of an existing debt; therefore, the Entity Defendants' claim that such a promised future occurrence also cannot serve as a qualifying "statement of fact" in order to allege fraud. However, the Entity Defendants misrepresent SRM's claim. Rather than a promise of a future occurrence, SRM asserts that GSA made a *present promise* to pay the accounts receivable while it did not intend to do so. Thus, the claim of fraud does not apply to a future occurrence—the final payment; rather, it applies to the present misstatement by GSA of its intention to pay its debts. This Court has stated that "[a]n action for fraud or misrepresentation will not lie for statements of future events." *Thomas v. Med. Ctr. Physicians, P.A.*, 138 Idaho 200, 207, 61 P.3d 557, 564 (2002). However, "[a]ll but a few courts regard a misstatement of a present intention as a misrepresentation of a material fact; and

---

[4] Fraud was not addressed in the Order related to the Entity Defendants' motion for a new trial.

a promise made without the intent to perform it is held to be a sufficient basis for an action of deceit, or for restitution or other equitable relief." *Mitchell v. Barendregt*, 120 Idaho 837, 843–44, 820 P.2d 707, 713–14 (Ct. App. 1991) (quoting W. Prosser & W. Keeton, Prosser and Keeton on the Law of Torts, § 109, pp. 762–65 (5th ed. 1984)). Idaho follows this majority rule. *Pocatello Security Trust Co. v. Henry,* 35 Idaho 321, 329, 206 P. 175, 177 (1922); *see also Tenzer v. Superscope, Inc.,* 39 Cal.3d 18, 216 Cal.Rptr. 130, 702 P.2d 212 (1985), *Von Hake v. Thomas,* 705 P.2d 766 (Utah 1985), and *Mountain Fir Lumber v. Employee Benefits Insurance,* 64 Or.App. 312, 667 P.2d 567 (Or.App.1983).

Consistent with such authority, we find there was substantial and competent evidence to support a jury finding that, at the time of any one of the Entity Defendants' promises to pay SRM, it did not intend to do so. Indeed, their very actions in this case confirm that their assurance that "there isn't a scenario where we don't get the backlog paid because that is the commitment we've made and will keep," proved to be demonstrably false. As already noted, GSA voluntarily took on the responsibility of tracking shipments for SRM. Its failure to properly do so provides adequate evidence to support a jury finding that the Entity Defendants were engaged in obfuscation of the record of its debts even as it promised to pay them off. Further, as the district court observed, the jury reasonably could have interpreted the transfer of business to FFL as a scheme to shield SRM from reaching the Entity Defendants' assets in the event litigation ensued. This could have reasonably been viewed as further proof the Entity Defendants did not intend to repay GSA's debts. Given that jurors could have reasonably interpreted the actions of the Entity Defendants as having made numerous promises to pay SRM—which they did not intend to keep—right up until the termination of their business relationship, we find that there was also substantial and competent evidence to support a finding that the Entity Defendants made a promise to pay SRM, but did not intend to do so.

Thus, there were many possible statements of fact attributed to the Entity Defendants, which reasonably could have served as the basis of the jury's finding of fraud against GSA and FFL. Accordingly, we affirm the finding of fraud against GSA and FFL.

### 2. SRM's claims against FFL satisfy the Statute of Frauds.

In 2016, FFL's "vArmory" platform became operational and began selling SRM products through that platform. FFL charged customers an additional 13.5% "processing fee," which it retained, while paying SRM the remaining sale proceeds; GSA was not paid any portion of these

sales. In the special verdict form, the jury found FFL liable to SRM for the same damages as GSA, and the jury found that an exception to the statute of frauds applied. The special verdict form did not require the jury to explain the basis for this finding. The district court did not specifically address this issue in its new trial order, stating only, "Had this court been deciding the issue it would have determined that GSA Direct was liable for damages and that when it passed the business to FFL Design, FFL Design became liable to SRM Arms for the amount due." The Entity Defendants argue that the statute of frauds applies and was not satisfied, thus, barring SRM's claims that (1) an implied contract existed between FFL and SRM, and (2) that FFL guaranteed GSA's debts to SRM.

Idaho Code section 9-505, the Idaho Statute of Frauds, sets forth that certain agreements are "invalid, unless the same or some note or memorandum thereof, be in writing and subscribed by the party charged, or by his agent." This includes "[a] special promise to answer for the debt, default or miscarriage of another, except in the cases provided for in section 9-506, Idaho Code." I.C. § 9-505(2).

The parties focus on the role of Turlington's May 2015 email and dispute whether it should be viewed as a signed writing that satisfies the statute of frauds. SRM's CEO wrote to Turlington at Turlington's FFL email address and copied Lehman at Lehman's FFL email address to complain about the failure of the Entity Defendants to pay the backlog. Turlington then replied from the same FFL email address, copying Lehman at Lehman's FFL email, and offered a list of solutions to the backlog. The first item on the list related to FFL seeking investors; it read: "Funding for FFL Design. This will allow us to shift a portion of operations cost from GSA Direct to FFL Design. By shifting these costs, it will allow us to begin a steady payment against the backlog. . . . ." Turlington concluded the email by promising the backlog would be paid:

> Jeff, you have been more than patient with us as we have worked to get this situation fixed. We ask is [sic] that you give us a few more months to pull the plans above into action and this will allow us to take care of the backlog once and for all. If none of these options above work then I think the only logical conclusion would be for us to stop selling the shotgun and go get jobs that will allow us to get the backlog paid. Regardless, there isn't a scenario where we don't get the backlog paid because that is the commitment we've made and will keep.

According to trial testimony by SRM's CEO, this email supported other promises made by the Individual Defendants that they and FFL guaranteed the debt. The Individual Defendants each

17

denied this at trial. SRM also asserts that the Individual Defendants made oral promises on many occasions that they or FFL would pay the backlog.

This Court has stated that "[i]n order to render an oral contract falling within the scope of the statute of frauds enforceable by action, the memorandum thereof must state the contract with such certainty that its essentials can be known from the memorandum itself, or by a reference contained in it to some other writing, without recourse to parol proof to supply them." *Mickelsen Const., Inc. v. Horrocks*, 154 Idaho 396, 401–02, 299 P.3d 203, 208–09 (2013) (quoting *Blumauer–Frank Drug Co. v. Young,* 30 Idaho 501, 505, 167 P. 21, 21 (1917)). "The memorandum which evidences the verbal agreement must contain all the terms of that agreement. Otherwise, it cannot be enforced at law or in equity." *Id.* (quoting *Hoffman,* 102 Idaho 187, 191, 628 P.2d 218, 222 (1981)). This Court must determine whether the Turlington/FFL email contains the essentials of a contract between SRM and FFL, either directly or by reference to FFL's relationship with GSA, in order to satisfy the statute of frauds. We hold that it does.

First, the email is a writing generated by FFL, signed by Turlington as an FFL principal, and includes Lehman as an FFL principal. Both Turlington and Lehman are individuals with authority to speak on behalf of FFL. Second, in the email, Turlington on behalf of FFL makes a clear promise to pay the backlog, outlining methods and timelines for repayment directly related to FFL, including investment in FFL and that the Individual Defendants would "stop selling the shotgun"—a practice engaged in by only GSA at the time but with the intent that FFL would be the future purveyor of SRM products—in order to secure jobs that would allow them to pay the debt. Notably, the Entity Defendants appear to have planned to shift distribution of SRM products from GSA to FFL, indicating that the proceeds generated to pay the backlog would, in the future, come from FFL sales. Nowhere does Turlington state on behalf of FFL that GSA will pay the backlog; instead, the email reflects the evolving nature of the business relationship between the entities—that FFL is indistinguishably intertwined with GSA and would be taking over the distribution of SRM's products and would be liable for GSA's debts.

We hold that the email sufficiently establishes the essentials of the contract in that it acknowledges that FFL will do whatever is necessary to pay the backlog. Therefore, FFL was liable to SRM because the statute of frauds was satisfied.

**3. Because the verdict form failed to clearly specify that unjust enrichment is an alternate theory, the district court erred by failing to consider whether the jury's award of damages for both breach of an implied-in-fact contract and unjust enrichment was supported by substantial and competent evidence.**

The Entity Defendants have appealed the jury's finding that FFL was unjustly enriched, arguing there is insufficient evidence to support that conclusion. The district court made no specific findings concerning the unjust enrichment claim in its new trial order, except to note that "[h]ad this court been deciding the issue it would have determined that GSA Direct was liable for damages and that when it passed the business to FFL Design, FFL Design became liable to SRM Arms for the amount due." In the district court's decision on the motion for JNOV, it stated the following:

> After the SRM Arms relation with GSA Direct ended, FFL Design had responsibilities to SRM Arms. There was evidence to support the claim that SRM Arms did not receive full payment for transactions with FFL Design and that FFL Design gained a benefit of $42,949.00. The finding of liability and amount will not be disturbed on this motion, subject to the analysis of the motion for new trial.

The jury found that FFL had an implied-in-fact contract with SRM, and our conclusion above that the statute of frauds was satisfied supports this. Thus, we affirm the district court's conclusion that the evidence supported the jury's determination that FFL had an agreement with SRM to pay the backlog. However, a troubling question still remains: given the jury's finding that there was an implied-in-fact contract, was there a factual and legal basis for the jury to also award unjust enrichment damages? This is a question the district court did not directly answer; therefore, we must remand for that purpose.

We conclude that the jury instructions and jury verdict form once again blurred the issues. Jury Instruction 37 instructed the jury how to determine damages for an implied-in-fact contract. Jury Instruction 38 instructed the jury how to determine damages for unjust enrichment. However, the unjust enrichment instruction only subtly suggests that it is an *alternative* remedy, where an implied-in-fact contract has not been found, and not an *additional* remedy. Jury Instruction 38 reads, "Even when there is *no agreement* between the parties, the law will require one party to compensate another when the first party has been unjustly enriched by the actions of another." (Emphasis added). Yet, the verdict form failed to make clear that unjust enrichment was an alternative theory. The form should have stated that in order for the jury to award unjust enrichment damages, it must first determine there was *not* an implied-in-fact contract. However, it appears that the verdict form allowed the jury to award damages against FFL for both breach

19

of contract (either actual or implied-in-fact), *and* for unjust enrichment based on an implied-in-law contract.[5] This makes it evident that the jury's award of damages may have been improper because damages were awarded on both conflicting theories without explanation. Thus, the district court erred in failing to make specific findings concerning the sustainability of the unjust enrichment claim.

## C. The district court did not abuse its discretion in granting the Individual Defendants a new trial on liability and damages.

I.R.C.P. 59(a)(1)(G) provides that a court may grant a new trial due to "insufficiency of the evidence to justify the verdict . . . ." This Court has observed that a trial court considering a motion for a new trial must weigh all the evidence and make its own determination of the credibility of the witnesses, and then may grant a new trial if "the verdict is not in accord with his assessment of the clear weight of the evidence." *Sheridan*, 135 Idaho at 779–80, 25 P.3d at 92–93. The trial court has broad discretion in doing so and "may set aside a verdict even though there is substantial evidence to support it." This Court reviews the decision of the district court for abuse of discretion and does not weigh the evidence:

> The trial court is in a far better position to weigh the demeanor, credibility and testimony of witnesses, and the persuasiveness of all the evidence. Appellate review is necessarily more limited. While we must review the evidence, we are not in a position to "weigh" it as the trial court can.

*Id.* at 780, 25 P.3d at 93 (quoting *Quick,* 111 Idaho at 770, 727 P.2d at 1198.)). Instead, this Court looks to the process by which the district court reached its decision. *Id.*

The district court ordered a new trial on liability and damages against the Individual Defendants because it found the line between direct and alter-ego liability had become too blurred during the trial. Prior to the trial, the district court had bifurcated the trial, ordering a separate bench trial of the alter-ego claims against the Individual Defendants—that is, claims based on the argument that the Individual Defendants are liable for the Entity Defendants' debts because they are actually proxies for the Entity Defendants. However, it allowed the parties to proceed on claims of direct liability against the Individual Defendants based on promises each made to SRM in his individual capacity, separate from the liability of the Entity Defendants.

---

[5] For example, Question No. 17 on the verdict form asked: "What damages, if any, did FFL Design LLC's breach of the implied-in-fact contract cause SRM Arms, Inc.?" The jury answered by writing "$659,576.00 the same" in the space provided. Later, Question No. 27 asked: "Was FFL Design, LLC, unjustly enriched by its conduct with SRM Arms, Inc.?" The jury answered "Yes." The jury was then instructed to answer Question No. 28, which read: "What is the amount by which FFL Design, LLC, was unjustly enriched?" The jury answered on the space provided: "$42,949.00."

During closing arguments, counsel for SRM told jurors that, because GSA had no more money, the jury had to return verdicts against FFL *and* the Individual Defendants in order for SRM to recover any damages, saying: "GSA is a shell corporation. You can give us a judgment against GSA, but it's useless. They have already tried to dissolve it once. We have to have a judgment against the three individuals and FFL." Neither the Individual Defendants nor the Entity Defendants objected to the statement, nor did any party move for a mistrial. The jury returned verdicts against the Individual Defendants as follows:

(1) Breach of implied-in-fact contract: $294,356 against Turlington and Lehman; $113,814 against Fitzgerald
(2) Fraud: $294,356 "the same" against Turlington and Lehman
(3) Aiding and abetting: $294,356 "the same" against Turlington, Lehman, and Fitzgerald

In considering the Individual Defendants' motion for a new trial, the district court observed that the statement by SRM's counsel that the jury had to award damages against FFL and the Individual Defendants if SRM was going to receive any money "pretty much swept away the distinction between the individuals as principals of the LLCs and their individual actions separate from the LLCs." Though the jury was instructed to consider the liability of the Individual Defendants only regarding actions taken in their individual capacities, and not as proxies for GSA, the district court found that, upon review, "the instructions were not adequate to withstand the argument that a verdict against the LLCs was worthless and the jury must find the liability on behalf of the individuals to have meaning." The district court did not consider the alternative bases raised by the Individual Defendants for granting or denying the Individual Defendants' motion for a new trial.

Thus, the district court's basis for granting a new trial against the Individual Defendants was two-fold. First, the district court observed that the "improper" statement made during the closing argument by SRM's counsel had "pretty much swept away the distinction" between individual and proxy liability. Second, the district court found that the jury instructions "were not adequate to withstand the argument that a verdict against the LLCs was worthless" without finding FFL and the Individual Defendants liable for the damages GSA would not be able to pay. These two findings are closely related, but they have independent legal significance and we consider each in turn.

**1. The closing statement made by SRM's counsel is not a valid basis for a new trial because the Individual Defendants did not make a timely objection.**

21

The Individual Defendants argued, in part, that the improper statement made by SRM's counsel during closing arguments justified granting a new trial. To repeat, counsel for SRM stated, "GSA is a shell corporation. You can give us a judgment against GSA, but it's useless. They have already tried to dissolve it once. We have to have a judgment against the three individuals and FFL." According to the Individual Defendants in their post-trial motion, this destroyed any distinction between the direct liability of the Individual Defendants—which was being considered in the trial—and the proxy liability of the Individual Defendants—which was to be considered in a separate trial.

To the extent that the district court based its decision to grant the Individual Defendants' motion for a new trial on these arguments, we disagree. This Court has previously held that a timely objection is required to preserve an issue for appeal or post-trial motion where a party believes a closing statement by counsel "impassioned the jury to the appellant's prejudice":

> The record does not disclose what objection, if any, was made to that statement by respondents' counsel, nor what ruling, if any, was made on that objection. If, during the course of a trial, counsel for one of the parties [sic] litigant is guilty of conduct which counsel for the other party believes is prejudicial to his client's rights, it is the duty of the latter to make objection thereto, and to ask that the jury be instructed to disregard it, or to move for an order declaring a mistrial. A litigant is not permitted to remain silent under such circumstances with a view to accepting the benefits of a judgment if he wins and of having it vacated and set aside if he loses.

*Annau v. Schutte*, 96 Idaho 704, 707–08, 535 P.2d 1095, 1098–99 (1975) (quoting *Shaddy v. Daley*, 58 Idaho 536, 540, 76 P.2d 279, 281 (1938)). In *Johnson v. Emerson*, the Idaho Court of Appeals addressed circumstances where counsel may have avoided objecting during a closing argument so as not to alienate the trial court or emphasize the objectionable comment. 103 Idaho 350, 354–55, 647 P.2d 806, 810–11 (Ct. App. 1982). The Court of Appeals interpreted *Annau* to allow counsel to "raise the alleged improprieties by a motion for mistrial or by other appropriate means, *before the case is submitted to the jury*," thus also preserving the issue for post-trial motions or appeal. *Id.* (emphasis added).

Nothing in the record indicates that the Individual Defendants acted to preserve this issue, by either objecting at the time SRM's counsel made the statement, or objecting prior to the case being submitted to the jury. As such, we hold that the objection to the statement by SRM's counsel was not preserved and, accordingly, cannot alone serve as the basis for granting the Individual Defendants a new trial.

## 2. The district court did not abuse its discretion in granting a new trial based on the inadequacy of the jury instructions to distinguish between individual and proxy liability.

In its decision granting the Individual Defendants' motion for a new trial, the district court wrote that "the instructions were not adequate to withstand the argument that a verdict against the LLCs was worthless and the jury must find the liability on behalf of the individuals to have meaning." The question of the adequacy of the jury instructions is a matter of law that we freely review. We conclude that the district court correctly determined that the jury instructions in this case proved fallible in keeping the jury from considering proxy liability claims against the Individual Defendants in reaching its verdict.

We note again that, while reviewing the decision of a district court to grant a new trial based on insufficiency of evidence, we do not re-weigh the evidence because the district court is in a far better position to do so, having sat through the trial. *See Sheridan*, 135 Idaho at 779–80, 25 P.3d at 92–93. Our task is to review the district court's analysis, mindful of the fact that a district court has broad discretion in ordering a new trial and may set aside a verdict even if there appears to be substantial evidence in support of that verdict. *Id.*

With this in mind, we consider the district court's conclusion that the jury instructions were inadequate and that it was impossible to discern whether the jury's finding that the Individual Defendants were liable was due to their actions as individuals separate from GSA and FFL, or if the jury intermingled those claims with the considerations of proxy liability improperly suggested by SRM's attorney during closing argument. While the statement made by SRM's counsel during closing arguments alone cannot justify granting a new trial, it may nonetheless weaken the confidence that the district court had in the effectiveness of the jury instructions to keep improper claims out of the jury's deliberations and, by extension, its confidence in the basis for the damages awarded by the jury to SRM. The district court's observation that the improper statements swept away any distinction between direct and proxy liability further underscores the district court's perspective that the jury instructions were insufficient to withstand a "forceful" closing argument from SRM's counsel, which risked blurring the claims. Importantly, because the jury verdict form does not delineate the basis for liability determined against each individual defendant, we cannot say that the district court is incorrect in its analysis. Thus, it raises the specter that it is possible, if not likely, that the jury determined liability against the Individual Defendants under an alter ego theory—as individuals

23

acting on behalf of the LLCs—rather than solely a direct liability theory, against the individuals acting in their own capacities. This position is only strengthened by our conclusion above that the jury may have intended to award *total* damages of approximately $702,525, which could be paid by *either* the Entity *or* the Individual Defendants. In other words, it supports a view that the jury actually held the Individual Defendants liable as proxies for the *same* damages as the Entity Defendants—even though the jury instructions said they should not—rather than independently liable for their own actions.

Even if there were substantial evidence to support the jury's finding of direct liability against the Individual Defendants, we defer to the district court's factual determination that the jury's verdict went against the clear weight of the evidence, especially where counsel exhorted the jury to make such a finding on an improper basis. Accordingly, we affirm the district court's decision to grant the Individual Defendants a new trial on liability.

### 3. The district court did not abuse its discretion in granting a new trial on damages against the Individual Defendants.

Our conclusion above that the district court did not err in ordering a new trial on liability for the Individual Defendants necessarily requires a new trial on damages against the Individual Defendants as well. The district court concluded that the jury may have improperly held the Individual Defendants liable as proxies for the misconduct of the Entity Defendants—even though proxy liability was not an issue in this trial—in order to make certain *someone* paid the awarded damages. Therefore, it follows that any damages awarded against the Individual Defendants as possible proxies for the Entity Defendants would be tainted by passion or prejudice. Accordingly, we affirm the district court's granting of a new trial on damages against the Individual Defendants.

### D. No party is entitled to attorney fees and costs.

The parties seek attorney fees and costs on appeal pursuant to Idaho Code section 12-120(3), which states:

> In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, or contract relating to the purchase or sale of goods, wares, merchandise, or services and in any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs.

> The term "commercial transaction" is defined to mean all transactions except transactions for personal or household purposes. The term "party" is defined to

24

mean any person, partnership, corporation, association, private organization, the state of Idaho or political subdivision thereof.

SRM and the Individual Defendants also seek costs and fees pursuant to Idaho Code section 12-121, which provides the following:

In any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation. This section shall not alter, repeal or amend any statute that otherwise provides for the award of attorney's fees. The term "party" or "parties" is defined to include any person, partnership, corporation, association, private organization, the state of Idaho or political subdivision thereof.

This Court has stated that an appeal will be considered frivolous where "an appeal simply disputes the trial court's factual findings, which are supported by substantial although conflicting evidence." *Elec. Wholesale Supply Co. v. Nielson*, 136 Idaho 814, 828, 41 P.3d 242, 256 (2001).

We find no clear prevailing party on the claims presented and, accordingly, award no attorney fees or costs under section 12-120(3). Given the difficulties presented by the complexity of the trial and the inadequate jury instructions, we also cannot find that any party pursued or defended their case frivolously, unreasonably, or without foundation; thus, we also deny attorney fees and costs to all parties under section 12-121.

## IV. CONCLUSION

For the previously stated reasons, the decision of the district court is affirmed in part, reversed in part, and remanded in part. Regarding the Entity Defendants, we reverse and remand the case to the district court for reconsideration of the remittitur, or in the alternative, a new trial, in light of our conclusion that a possible alternate basis for the jury's verdict may exist. We affirm the district court's decision upholding the verdict of fraud against GSA and FFL. We also affirm the district court's decision to uphold the verdict that FFL is liable to SRM; however, we do so because the statute of frauds was satisfied and not, as the jury decided, because an exception to the statute of frauds applied. We reverse the district court's decision to uphold the finding of unjust enrichment and remand for further consideration of whether there was substantial and competent evidence in the record supporting the jury's award of damages against FFL for both breach of an implied-in-fact contract and unjust enrichment.

Regarding the Individual Defendants, this Court affirms the district court's granting of a new trial on liability against the Individual Defendants. Although we conclude that the closing

25

statements by SRM's counsel were not timely objected to and cannot serve as a basis for granting a new trial, we affirm the grant of a new trial based on the district court's finding that the jury instructions and verdict form were inadequate to the task of keeping out the proxy liability claims against the Individual Defendants. We also affirm the district court's awarding of a new trial on damages against the Individual Defendants.

Chief Justice BEVAN, and Justices BRODY, STEGNER and BURDICK **CONCUR.**